## OLD COLONY R. CO. v. NEW YORK, N. H. & H. R. CO.

### No. 379.

Circuit Court of Appeals, Second Circuit.
July 25, 1938.

Robert G. Dodge and Talcott M. Banks, Jr., both of Boston, Mass., for Old Colony R. Co.

Nathaniel W. Smith, of Providence, R. I. (James Garfield, of Boston, Mass., Hermon J. Wells, of Hartford, Conn., and Herbert H. Corbin, of New Haven, Conn., of counsel), for New York, N. H. & H. R. Co.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up on the appeal of both parties from an order in bankruptcy in a proceeding to reorganize the New York, New Haven & Hartford Railroad under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The Old Colony R. R. filed two claims against the debtor, which together contained seven different items; and the New Haven filed a cross-claim as a set off. The general background of fact was as follows: In 1888 the Old Colony R. R. leased the railroad of the Boston & Providence R. R. from that company for 99 years, and in 1891 the railroad of the Providence, Warren & Bristol for the same period: in 1893 it let its own road, together with the two roads just mentioned, to the New Haven for 99 years. The New Haven agreed to pay as rental a sum equal to 7% upon the common shares of the Old Colony from time to time outstanding; and that it continued to do until March 31, 1936, when its financial difficulties made further performance impossible. Before this—on October 23, 1935—it had filed a petition of reörganization under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, and its trustees rejected the lease on the 1st of June following. The Old Colony is also in reörganization: it has rejected its lease from Providence, Warren & Bristol, but not the lease from the Boston & Providence. As each of the seven items of both claims raises separate questions, it will be more convenient to treat them as separate causes of action.

(1) The Claim for Future Rent against the New Haven.

The Old Colony claimed damages for the whole remainder of the New Haven term: that is, 7% upon its outstanding common shares from the date of rejection, discounted to its present value, and reduced by the present value of the term for the same period. It relies upon a part of the last paragraph of subdivision (b) of § 77, 11 U.S.C.A. § 205(b), which reads as follows: "In case an * * * unexpired lease of property shall be rejected * * * any person injured by such * * * rejection shall * * * be deemed to be a creditor of the debtor to the extent of the actual damage or injury, determined in accordance with principles obtaining in equity proceedings." It argues that, following the decision of the Supreme Court in City Bank Far-

mers Trust Co. v. Irving Trust Co., 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324, this language created a new right of action, like that created by a covenant permitting a lessor to re-let and charge the lessee with his loss. We agree, for, while that case arose under subdivision (b) of § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207(b), the language of the two sections is so closely alike that a similar right of action must be implied under § 77, 11 U.S.C.A. § 205. We so decided in Re New York, New Haven & Hartford R. Co., 2 Cir., 95 F.2d 483. The claimant then proceeds that, since damages upon such a right of action are "to be determined in accordance with principles obtaining in equity proceedings", William Filene's Sons Co. v. Weed, 245 U.S. 597, 38 S.Ct. 211, 62 L.Ed. 497, lays down the proper measure which is the measure it invokes. The judge did not agree as to this: he allowed nothing for future damages, but postponed liquidation of the "actual", i. e. past, damages to the latest possible moment. In Re New York, New Haven & Hartford R. Co., supra, we approved this as well, and we shall follow that decision now. Even if we were free, we should not have sustained the full extent of the plaintiff's claim: it is a fanciful notion that one may forecast the future value of a railroad half a century hence. We need not say whether, if the matter were for the first time before the court as now constituted, a majority might have been disposed to allow future damages for a period of say five or ten years, on the theory that present estimates for as long as that might have some validity. We affirm the ruling on this item.

(2) Claim Based upon the New Haven's Covenant to Perform the Old Colony's 'Obligations to the Providence, Warren & Bristol.

■ The New Haven's lease (Article XI), provided that the New Haven was to "assume and pay all the * * * obligations of the lessor * * * and to keep and perform all * * * the contracts relating to the said demised premises * * * now in force and binding on the lessor * * * and as to property leased to the lessor the lessee shall be subject to the leases under which such property is held". This undertaking included the rent due to the Providence, Warren & Bristol from the Old Colony under the lease of 1891. The Old Colony, against which the Providence, Warren & Bristol has filed a claim in reörgan-

ization, as it has against the New Haven, now claims against the New Haven in the amount of the Providence, Warren & Bristol's claim against itself. The judge disallowed this item, because he thought that the loss was due to the Old Colony's rejection of the lease, for which the New Haven could not be responsible, as it was the independent act of a third person. We need not pass upon the correctness of that ruling, because the claim is not allowable for another reason. The New Haven's covenant to discharge the Old Colony's obligations to the Providence, Warren & Bristol, made it the principal as between itself and the Old Colony, since the eventual loss was to fall upon it. All sections of the Bankruptcy Act apply to the proceeding under § 77 as though a voluntary adjudication had been entered on October 23, 1935: § 77(*l*), 11 U.S.C.A. § 207(*l*). Section 57(i) of that act, 11 U.S.C.A. § 93(i), allows a surety to file a claim against a principal in the creditor's name, if the creditor does not do so himself; but here the creditor, the Providence, Warren & Bristol, has filed a claim against the New Haven. The Old Colony may not file another on its own account, and receive a second dividend on the New Haven's single obligation. J. S. Farming Co. v. Brannon, 6 Cir., 263 F. 891. A creditor may indeed prove against both principal and surety, but that is because he has two separate claims; really he has security upon a single claim. But there can never be more than one claim against the principal. We affirm the judge as to this item.

(3) The Claim for Equipment.

■ By Article XV of the lease the New Haven covenanted to "furnish all equipment in addition to that hereby demised which may be necessary * * * and maintain said demised premises and property during said term in good condition and up to its present standard as a railroad; and that it will make all additions, alterations, improvements and betterments which may be necessary or proper with reference to the premises and property hereby leased; and that all lands, structures, improvements, betterments and renewals so added to or made upon this real estate * * * shall become the property of the lessor and a part of the demised premises; and that at the expiration of this lease whether by lapse of time or otherwise, it will deliver to the lessor possession of said demised premises and leased property

\* \* \* together with any and all additions and substitutions which may have been made thereto \* \* \* and will also return or deliver in lieu of the personal property set out in the inventory hereinafter provided to be made the same or other personal property of similar character, value and uses and appropriate for the operation of the lessor's railroad." Article XVII provided "that an inventory and appraisal of all the personal property hereby demised \* \* \* shall be made as of the 1st of March 1893." Such an inventory was in fact made of all the rolling stock —locomotives, passenger cars, freight cars —and of all machinery, tools and equipment at the railway stations, repair shops, engine houses and the like. It described them in kind, and set a figure opposite to each as its appraised value. Both sides agree that the Old Colony is to have some allowance for equipment, but the New Haven says that it must be measured by the appraised value of the inventory, while the Old Colony claims the present value of all the rolling stock, tools, machinery and other movable equipment, which have been allocated, or are appurtenant, to its own road, or necessary to its operation. The judge accepted neither position; he liquidated the claim at the present value of rolling stock of the same "work capacity" as that contained in the inventory, disregarding the appraised value. As for the other equipment, he took it at the inventory price, because the Old Colony had failed to make any other proof. The Old Colony is content with this allowance, and the question is between it and the New Haven's claim. It will have been observed that Article XV distinguished between the New Haven's engagements as to improvements upon the land and as to the personal property turned over in 1893. The Old Colony was to keep all improvements; but "in lieu of the personal property" it was to receive other "property of similar character, value and uses and appropriate for the operation of the lessor's railroad". There was a good reason for this difference, because although the New Haven was in the first instance to pay for all improvements to the realty, the Old Colony agreed in Article V to "issue" bonds or shares for them, so far as lawful, and with the proceeds to repay the advances of the New Haven. Thus as to improvements the New Haven took no other chance than that the Old Colony might not be able to float new securities: not so as to the

equipment, and we are all agreed that the judge was right in rejecting the Old Colony's claim that it should receive back enough equipment to operate an improved and extended road. But as to whether the Old Colony should be confined to the inventory appraisal, my brothers take one view, and I the other. I shall try to state their view as forcefully as I can. They think that the provision for an appraisal in Article XVII, taken with the concluding phrase of Article XV: "of similar character, value and uses, and appropriate", etc., admits of no fair doubt. They agree that an inventory might have been taken though the purpose had been merely to identify the leased property, but when each item inventoried was appraised at an agreed value, they say that that could signify only one thing: that the lessee, which in the nature of things would not be able to surrender the identical property originally leased, might measure its liability in dollars and cents. Were it not so, they add, a troublesome and vague standard would be set up of the working equivalent of a mass of rolling stock, tools, machinery and the like, long since obsolete, which had disappeared presumably without record. The Old Colony was only to be put back where it was in 1893: it was not to make any kind of profit out of the New Haven, except in the possible event that at reëntry the New Haven might have neglected to require it to fund some part of the expenses for improvements. Finally, if there could otherwise have been any doubt, the word, "value", in Article XV, lays it, for that word could have no conceivable function except as a measure of damages. "Property of similar character and uses, and appropriate", etc., would have completely expressed the intent, if the judge were right: "value" must, therefore, have meant what it said, and what by their appraisal the parties provided for.

I feel the force of all this, yet I think that it unduly emphasizes the word, "value", at the expense of the general purpose of the parties. They were bargaining about a future situation in which all, or nearly all, the equipment of 1893 would have long since disappeared, and have been replaced by the New Haven for its own uses. It was this new equipment that by hypothesis the Old Colony would get back, and it would be necessary to the continued operation of the road. The question was really whether it should have to pay anything for it, except insofar as it had been increased to answer

the requirements of an extended or improved road. A railroad is worth what it can earn, and its earnings are measured by what it can get to haul and can haul. It is no benefit to it that its equipment costs more, whether because of a rise in the general price-level, or because of the progress of the arts. If the Old Colony gets no more equipment than would haul what its old equipment hauled, it gains nothing; and if it is compelled to pay more for such equipment it is not getting back what it gave. Nor is the New Haven called upon to pay what it would probably not have accepted. It ought not to expect to recover for any part of what, from a railway point of view, is the same equipment that it got. Were it not for the word, "value", there could have been no doubt at all; and if that is to be so dominant, the whole clause was a cumbersome and unnecessary locution. It was quite enough to say that upon surrender the New Haven should be charged only with the appraised value of the inventory. Why add the rest? Besides, the word itself does not inexorably import value, measured in dollars; it might mean value for railway purposes. It is held not to do so chiefly because of the appraisal, but I cannot see that that is conclusive. I can imagine that an appraisal might have been thought serviceable to help identify items which could not be very expressly described to persons who should have to deal with the matter ninety-nine years later. However, as I have been unable to satisfy my brothers, the order will be reversed as to this item which will be allowed at $4,587,627.04.

(4) Permanent Improvements upon the Boston & Providence R. R.

Between 1888 and June 30, 1893, the Old Colony as operating lessee of the Boston & Providence, spent about half a million dollars on permanent improvements to the leased property, in performance of its covenant in that lease to "make all permanent improvements on said railroad and property at its own expense", and to redeliver the road at the conclusion of the lease to the lessor "together with all permanent improvements thereon". Between June 30, 1893, and May 29, 1905, it continued to pay for other improvements in the total sum of about $2,800,000. As we have said, the New Haven had covenanted in Article XI "to keep and perform all * * * contracts relating to said demised premises * * * now in force and binding on the lessor

* * * and as to property leased to the lessor, the lessee shall be subject to the leases"; and that promise covered these payments. The record contains no explanation of why such large arrearages had been allowed to accumulate, but on May 29, 1905, the parties came to a written agreement which the New Haven now insists amounted to an accord and satisfaction of the claim. This recited that the Old Colony had made certain improvements upon the Boston & Providence property and that other such improvements would be necessary in the future, and it provided that the New Haven should open an account to which it would charge all permanent improvements upon the Boston & Providence and credit each year as payment that proportion which one year bore to the unexpired term of the Boston & Providence lease. After providing for the possibility of a termination of the New Haven lease while the Boston & Providence lease was still outstanding, the agreement concluded as follows: "If the lease of the Boston & Providence * * * shall be so terminated as that * * * the Boston & Providence shall become liable to pay to the Old Colony * * * any sum on account of permanent improvements which may have been made and paid for by the Old Colony * * * or by the New York, New Haven & Hartford R. R. * * * then such payment shall be made to * * * the company which has paid for the improvements so that the Old Colony * * * shall receive payment for such permanent improvements * * * as may have been paid for by it, and the New York, New Haven & Hartford * * * shall receive payment for such * * * as may have been paid for by it." Thereafter the Old Colony paid for no permanent improvements on the Boston & Providence, although many were made by the New Haven, and the New Haven paid no part of its debt to the Old Colony. The question is whether this contract and the long inaction of the Old Colony in asserting its rights constitute a discharge of the New Haven's obligation. There could have been no accord and satisfaction, for, quite aside from the embarrassment of finding any agreement to cancel the New Haven's claim, there was no consideration. We are asked to assume that some question had arisen about the New Haven's liability under Article XI and that this was a compromise, leaving the payments already made to lie as they lay, and making the New Haven unconditionally liable in the

future. Such an assumption must be made out of whole cloth: There is not a whisper in the record of any dispute over the meaning of Article XI, nor was there any apparent ground for one. Moreover, it is surely very strange that if a discharge was intended, nothing should have been put in to the contract about it; although we must own that it is also strange that nothing should have been said about the past payments except that if the Boston & Providence repaid any part of them, it should be allocated to the party which had originally borne it. Much was certainly left at loose ends, but we cannot hold that there was an accord without more evidence to support it. We affirm the order as to this item.

### (5) Maintenance of the Old Colony Property.

■■ As has already appeared, the New Haven in Article XV of the lease covenanted to keep the leased properties "in good condition and up to its present standard as a railroad". The New Haven made over an engine-house in Providence into a garage; it tore down an engine repair-shop in Boston; an engine terminal in Boston became inadequate for modern locomotives. The New Haven answers that these buildings were not standing in 1893, or at least not completed, and that the covenant did not cover them. There is no reason so to limit its undertaking; buildings are part of the realty, and they belonged to the Old Colony whenever they were erected; the New Haven was bound to keep them not only in repair, but up to date. The next answer is that the covenant went only to the road as a whole; if, for instance, one building was torn down, it did not count, provided its place was supplied by another, or in another way. That may be true—we shall assume so—and perhaps in the end the issue comes down to one of procedure; but as soon as the Old Colony showed that a given building was destroyed, or that its use had been wholly changed, or that it had become obsolete, the New Haven was at least bound to prove that it had provided equal accommodations of the same kind somewhere else upon the property. It would not be reasonable to charge the Old Colony with the burden of proving the character of the whole road, and of showing that it had been allowed to fall behind in general. The New Haven did not show that it had built elsewhere on the Old Colony property the equivalent of these three buildings and we affirm the judge as to this item.

### (6) Moneys Had and Received.

This is a small item of about $60,000 as to which we understand there is no dispute.

### (7) Bank Loans.

■ On July 1st, 1932, a million dollars in principal of an issue of Old Colony bonds matured. Market conditions made it impracticable to refund these at that time, and the road borrowed the money to redeem them by discounting with banks two notes, secured by $1,500,000 of a new series of its bonds, not yet sold to the public. The notes were renewed from time to time, and were outstanding at the date of the New Haven's petition for reorganization: The Old Colony now asserts that they have a claim against the New Haven under its covenant in Article XI, in which it agreed to "provide for the payment in the manner hereinbefore mentioned of the principal of all funded indebtedness * * * and to assume and pay all the other obligations of the lessor of every name and nature as the same shall from time to time fall due". The phrase, "manner herein before mentioned", refers back to Article V, but it is not a very apt reference. Article V mentioned no way by which the New Haven should provide for the payment of Old Colony indebtedness, except that it would request the Old Colony to issue bonds or shares. Nevertheless, we agree with the judge that there is no other earlier article which can possibly have been intended, and with him we think that Article XI meant the New Haven to pay all obligations of the Old Colony and to recoup itself only out of the proceeds of the Old Colony's lawfully issued securities. But that did not bind the New Haven to pay bonds which had once been duly issued, and which had therefore "funded" an indebtedness. The Old Colony does not so assert; but it says, and the judge held, that when an issue had matured and was not paid, but was extended by notes, the notes were no longer "funded indebtedness" within Article XI, but "other indebtedness", and the New Haven became liable for them. This seems to us an unreal way to read the stipulation; we cannot suppose that after the Old Colony had once "funded" a debt by an "issue", its own default could reimpose the obligation upon the New Haven. Such an interpretation would put the final incidence of the debt at the hazard of the market when an issue matured: "other indebted-

ness" we read as "indebtedness never funded".

 The other part of the claim, $400,000, rested upon a note for that amount, held by a Boston bank, and also secured by a pledge of bonds not yet issued. It was to pay for past permanent improvements to the Old Colony Line, which the New Haven had paid for, and for which it had not been reimbursed. On January 19, 1934, the market was again poor for floating a new issue of bonds, and they were pledged as security. The note was renewed from time to time, and remained unpaid when the New Haven's petition was filed. The record does not disclose why the Old Colony undertook in this way to relieve the New Haven, but it is fairly to be inferred that it was in performance of its own obligation under Article V to issue bonds or shares at the New Haven's request. The Old Colony's application to the Interstate Commerce Commission was in the alternative; either to sell part of the new issue not yet on the market, or to pledge them with the note. The Interstate Commerce Commission did not allow the bonds to be sold, but did allow them to be pledged; and under the circumstances we think that the transaction should be treated as a "funding" of the debt. That word is to be interpreted along with Article V, which defined the Old Colony's duty; it was to "make such lawful issue * * * of bonds or of stock, or both as shall be necessary and proper to be issued." The pledge was a "lawful issue" pro hac vice; at least the Old Colony may not deny it, for, as we have said, the transaction was certainly to reimburse the New Haven and if the parties were following the lease, that was the path. At any rate it is incredible that having gone to this shift to relieve the New Haven, the burden should now shift back. We reverse the allowance of the seventh item in toto.

(8) The New Haven's Counterclaim.

The New Haven's counterclaim consists of a large accumulation of disbursements made by it for improvements upon the Old Colony property, none of which were ever refunded. For reasons already appearing, we think that under Article XI these were on the New Haven's own account, there being no evidence that it ever "requested" the Old Colony to "issue" securities to fund them. At first blush this result may seem somewhat harsh, since the Old Colony gets the benefit of the improvements without paying for them. On the other side, it is to be remembered that the New Haven had complete control over what improvements should be made, and incurred the expense with full understanding that it was to be paid only by a flotation of Old Colony securities. The duration of the lease was not fixed, the improvements were for the New Haven's own benefit while it lasted, it had power at any moment which it thought apt to "request" the Old Colony to fund the debt. Its forbearance is now treated as a virtue for which it should not be made to suffer, but we are not impressed. All sorts of considerations of personal interests may have dictated its decision to let things stand; and in any case voluntary forbearance, if it exercised any, is legally irrelevant. We affirm the order as to this item.

The order will be affirmed as to items 1, 2, 4, 5, 6 and 8; as to item 3 it is allowed in the sum of $4,587,627.04; it is reversed as to item 7, which is disallowed in toto.