**EWEN et al. v. PEORIA & E. RY. CO.**

**GILBERT et al. v. SAME.**

District Court, S. D. New York.

July 8, 1940.

334

Jacob Aronson and Crosby J. Beakes, both of New York City, for petitioner.

Charles S. Aronstam and Archie S. Karp, both of New York City, for income bondholders.

Louis G. Bernstein, Julius J. Rosenberg, Leonard B. Frutkin, and William J. Reinhart, Jr., all of New York City, for first mortgage bondholders.

Before L. HAND, Circuit Judge, and WOOLSEY and HULBERT, District Judges.

L. HAND, Circuit Judge.

The facts are sufficiently stated in the report of the Interstate Commerce Commission, 239 I.C.C. 303, 320. (March 27, 1940), passing upon the plan, and we shall accept it as the background for our discussion. The objections are chiefly because the plan disregards rights originally secured to the intervenors in the reorganization of the Ohio, Indiana & Western Railroad, a mortgage upon which was foreclosed in 1889. On the sale under the decree in that suit, Coster and Spencer, who were acting for a committee of the old bondholders, bought in the property and effected a reörganization by a series of documents all dated February 22, 1890, implementing an earlier agreement of October 30, 1889. The general outline of the reörganization was that the Ohio, Indiana & Western Railway, which had been operating a road from Peoria, Illinois, to Springfield, Ohio, should be divided into two parts at the City of Indianapolis. The "Big Four" railroad (now controlled by the New York Central) bought in the eastern part in fee (which we shall call the Springfield Division), paying for it by giving to Coster and Spencer a lien upon it of $5,000,000, due on April 1, 1940, the principal of which it did not bind itself to pay, though it guaranteed the interest at four per cent. The western part of the road (which we shall call the Illinois-Indiana Division) Coster and Spencer conveyed to a new cor-

poration, the Peoria & Eastern, the petitioner here. That is to say, they conveyed the fee of that part which was in Illinois, and they leased in perpetuity that part which was in Indiana, conveying the reversion later. (Why this curious device as to the Indiana part was adopted, does not appear.) The petitioner paid for the Illinois-Indiana Division in bonds and shares of the new road, delivered to Coster and Spencer and by them presumably distributed among the old bondholders of the Ohio, Indiana & Western Railway. The "Big Four" bought half the shares and made an operating agreement with the new road by which it was granted the privilege of operating the Illinois-Indiana Division for fifty years, in consideration of which it was to pay all operating expenses, and the interest on the mortgages just issued to Coster & Spencer, as well as that on two mortgages already on the property, one for $500,000 which covered both divisions, and the other for $1,000,000 which covered only the Illinois-Indiana Division. The plan proposes to extend this agreement for twenty years beyond April 1, 1940, and the first question is whether the New York Central has the right to do so against the opposition of the intervenors.

(1) The Extension of the Operating Agreement.

The first article of the operating agreement, so far as pertinent, read as follows: "the Cleveland Co. shall and will henceforth and during the period of fifty years from April 1st, 1890, and for such further time thereafter as it may elect, use and operate" the Illinois-Indiana Division. It is possible to construe these words, either as giving the "Big Four" a license to remain in possession for as long as it chose after the expiration of fifty years, or as giving it an option, to be exercised before the expiration of the term, to extend it for another fixed period. The first would result in a mere tenancy at will, terminable by either party, or from year to year, and the income bondholders might in that case be prejudiced by the proposed extension for a fixed term. Substantially similar words were construed in Western Transportation Co. v. Lansing, 49 N.Y. 499, as creating a tenancy at will, or from year to year, and the decision is the intervenors' main reliance. It is to be noted, however, that the court very particularly (49 N.Y. page 508) refused to pass upon whether, if the clause had created an option giving the lessee a

privilege pending the term to extend it for a new, though indefinite, period, it would have been invalid; and the decision is therefore at most only an interpretation of the particular lease then before the court. It would not in any case be authoritative upon us, for the property at bar is in the States of Illinois and Indiana, where we have been unable to find any pertinent decisions; but it may be that in the case of an ordinary agricultural lease between individuals, like that there at bar, it is proper to interpret such a privilege as no more than a tenancy at will, or from year to year. On the other hand it seems to us quite inappropriate to adopt the same construction for an operating agreement between two railroads. The relation created involves elaborate and complicated operating adjustments, and to give either road a power to denounce it at will, or even at a year's notice, would put both in a position which, if not intolerable, would at least be extremely instable and unsatisfactory. We therefore construe the clause as giving the "Big Four" an option pending the term to extend it for a specified period in the future. (Whether more than one such extension was contemplated we need not decide.) The fact that the extension was left indefinite, and was to be fixed by the "Big Four", was immaterial; it has been law for over three hundred years that uncertainty in the length of a term at the time of the execution of a contract to grant it, is no objection, if its duration will become certain before it begins. Say v. Smith, 1 Plowden 269. The new term was here certainly for a "reasonable" period, assuming that such a condition was to be implied.

(2) Prejudice to the Income Bondholders by the Extension.

What we have just said disposes of the argument that the extension could operate to the prejudice of income bondholders. Their bonds were made expressly subject to the agreement, and, if we are right, that included the power to extend the term. It is true that by so doing the New York Central will be able to recoup for its past advances out of future income, a privilege which would have otherwise ended on April 1st, 1940; but if that was what the agreement intended, no wrong will be done. The suggestion that the original transaction is now subject to be reopened because the "Big Four" had bought half the Peoria & Eastern Railway's shares is without merit. In the first place, while the agreement was with the Peoria & Eastern, the transactions were in fact with Coster and Spencer, that is, with the old bondholders of the Ohio, Indiana and Western Railway, who presumably dealt with the "Big Four" at arms' length, who, as shareholders, were charged with knowledge of the whole transaction, and who were free to accept any conditions upon the income bonds that they chose. And that aside, we cannot understand how it can be seriously argued that after the lapse of fifty years, the contract should be unravelled, even if there had been substance in the objection at the outset.

(3) The Payments Due under the Operating Agreement.

The third article of the agreement provided that the "Big Four" should receive all the income of the Peoria & Eastern Railway, deduct "the expenses of operation and maintenance", taxes and the like, and, out of the "net" income so resulting and any income from the $5,000,000 lien upon the Springfield Division, should pay all interest falling due upon the two prior mortgages and the first consolidated mortgage. If anything were then left, the "Big Four" was to reimburse itself "for any advances hereunder in any previous year remaining unpaid to it (with interest thereon at the rate of six per cent. per annum)", and finally to pay any balance, first to the income bondholders, and after them to the shareholders. This language is unequivocal; it appropriated each year's surplus, to all accumulated advances; the income bonds were to receive nothing until these were all paid. The second article of the agreement contains language which, however, both intervenors insist modified the meaning of the third, and fixed a minimum rental of $412,200, which the "Big Four" was bound to pay, regardless of any reduction in the interest due upon the three mortgages. The passage relied upon was in substance that the "Big Four" agreed that it would "make good any deficiency which may at any time occur in the fund necessary" to pay the interest, "after devoting to such payment" the "net income" from the purchase-money lien on the Springfield Division, and "net earnings" of the two parts of the Illinois-Indiana Division. It guaranteed—and it is this language which is supposed to create a minimum rental—"that the net earnings and income from said three sources, so actually applied to the payment of said interest, shall not be less than four hundred and twelve thousand two hundred dollars" an-

nually for the whole period of fifty years. (The guaranty included in addition forty dollars for each bond, issued by the Peoria & Eastern above the amount provided at the time, $9,430,000.) It appears to us clear that this was intended only as a guaranty that the income of the road should pay interest on all the bonds outstanding, just as the guaranty of the purchase money lien did that the income of the Springfield Division should pay interest on the lien itself. The text alone demands that conclusion, for the guaranty does not cover generally the net earnings and the income of the road, but only those earnings and that income, when "actually applied to the payment of interest". One cannot apply money in payment of interest upon a cancelled bond. (It is perhaps worth while also to note that the covenant runs not only to the Peoria & Eastern, but to the bondholders as well.) It is true that the "Big Four" got the advantage of operation of the division for no more than a guaranty of its fixed charges; and possibly the bargain was indirectly worth more than that to it, though the actual operation appears to have been at a loss. Be that as it may, if more than a guaranty of the fixed charges had been intended, the parties would surely not have fixed a rental—for in that event there would have been a rental—at such sum as $412,200. That was an absurd sum, unless they were thinking in terms of the fixed charges. Furthermore, if it was a rental, the supposed lessee would normally not have had a charge for any deficit in operation. Both articles seem to us therefore to be harmonious, and to provide that the income bondholders should get nothing except any surplus over all current charges, past and present.

(4) The Accounts between the New York Central and the Peoria & Eastern.

■ Not only has a large operating deficit accumulated against the Peoria & Eastern, but a large "retirement" account and a large "depreciation" account have accumulated in its favor against the New York Central. The plan does not liquidate either of these, and the order of confirmation will leave open all questions touching their amount and validity. If the New York Central seeks in any year to withdraw any part of the earnings by way of recoupment, it must prove its right. All we now hold is that the covenant to maintain the road and to make additions to its equipment, did not contemplate gratuitous advances, and that the third article allowed recoupment for so much as was properly expended. Whether the cross items can be offset, the plan also leaves open.

(5) The Use of $500,000 First Consolidated Mortgage Bonds as Security for the Peoria & Eastern's Note.

■ The proceeds of a note of the Peoria & Eastern in favor of a subsidiary of the New York Central were used to take up the $500,000 of prior bonds that were a lien upon both divisions of the road. The security for this note was $500,000 of the first consolidated bonds and 1,730 shares of the Peoria & Pekin Union. The first question is whether the bonds were lawfully pledged under the mortgage, and that depends upon the seventh article. Fifteen hundred thousand dollars of the issue of ten millions was reserved to be issued "as may be necessary for the purposes of exchange for said prior bonds as hereinafter provided"; i. e., "when * * * the Railway Company shall deliver * * * to said Central Trust Company * * * any of said prior bonds * * * Central Trust Company shall issue to the Railway Company * * * an amount of said bonds so reserved equal at par to the amount of the said prior bonds so delivered at par". The argument is that the pledge was not such an exchange, and was therefore invalid. Even so, the lender would be entitled to be subrogated to the old bonds, paid by the borrowed proceeds. Subrogation is a purely equitable doctrine (Restatement of Restitution, § 162); it disregards form, and here, the transaction would have been entirely regular if the following form had been adopted. The lender could have bought the old bonds, holding them without turning them in for cancellation. It could then have surrendered them to the Peoria & Eastern, which could in turn have surrendered them to the trustee of the mortgage in exchange for new bonds, par for par. The Peoria & Eastern could at the same time have delivered the shares of the Peoria & Pekin Union as additional security for any difference in value between the old and the new bonds, for the first consolidated bondholders could not have complained if the road had used its free assets to carry through such a transaction. Since all this would have been entirely lawful, and would not have impaired any rights of the bondholders, equity will effect the

same result, even though the form chosen —i. e., a direct pledge of the bonds—was invalid.

The plan properly assumes, therefore, that the pledge was good; and deals with the note by treating $210,000 of the bonds as issued, and paying the remaining $290,000 at par out of the $5,000,000 by which the New York Central will cancel the lien on the Springfield Division. The lender must then release, not only the pledged bonds, but the 1730 shares of the Pekin & Peoria Union. The intervenor suggests that the bonds are now worth 60; if so, although no more than $174,000 should be allotted to the cancellation of the $290,000 of new bonds, the Peoria & Pekin Union shares will account for the balance, $116,000. It is true that the evidence of their value might be better, but it is reasonably apparent that there is nothing unfair in this part of the adjustment.

(6) Contribution by the Springfield Division to the Illinois-Indiana Division.

The question as to this is whether the $500,000 prior mortgage upon both divisions should be wholly assumed by the Illinois-Indiana Division, or whether the Springfield Division should contribute ratably to its discharge. The deed of Coster and Spencer to the "Big Four", conveying the Springfield Division, was indeed without warranty, but the question whether a mortgagor who conveys part of the property means to make the lien a primary incumbrance on what he retains, cannot be answered merely by recourse to the conveyances, or the order of their execution; it must be gathered from the implications of the particular transaction. The operating agreement required the net income from the purchase-money lien on the Springfield Division to be used to pay interest upon all three mortgages, the $500,000 mortgage among them, and therefore as to interest the Springfield Division was certainly not to contribute. The same intent appeared also as to the principal, because, although the first consolidated mortgage did not cover the Springfield Division at all, it provided that new bonds might be exchanged for the bonds of the $500,000 mortgage. Moreover, by the fifth article the Peoria & Eastern promised to "pay at the maturity thereof all principal of such of said prior bonds as shall not have been previously taken up by exchange". Since all the papers were parts of a single transaction and are to be read together, the mortgage

was intended to be a burden on the Peoria & Eastern. The intervening first consolidated bondholders deny this; they explain the covenant as merely making it a default under the consolidated mortgage for the Peoria & Eastern not to pay the prior mortgages at their maturity. But if that was the only purpose, it did not require an assumption of the mortgages by the Peoria & Eastern; all that was necessary was to declare that default upon the prior mortgages should be a default upon theirs. Moreover, after any of the old bonds were exchanged for new the lien on the Springfield Division was on any theory pro tanto extinguished. Why should contribution exist only as to those that might not be exchanged? We can see no reason therefore for so circumscribing the significance of the covenant. In any event all these circumstances taken together satisfy us that the lien of the $500,000 prior mortgage was to be upon the Illinois-Indiana Division alone.

(7) The Unfairness of the Plan to the First Consolidated Bondholders.

The first consolidated bondholders argue that the extension of the operating agreement is "unfair" within the doctrine of Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, because it allows the New York Central to recoup out of the income of the Peoria & Eastern properly applicable to the bonds, although the accumulated advances are a junior claim. This, as we have seen, is not a valid position in the mouth of the income bondholders because they took subject to an extension of the operating agreement; but that is not true as to the first consolidated bondholders, and the answer must depend upon other considerations. Under the plan the New York Central guarantees interest for twenty years on the remaining principal of the bonds, and their maturity is extended accordingly. Since this will take only $188,000, and the present estimated income of the road is about $304,000, at first blush the plan appears to create an unlawful priority in favor of junior claims. However, the situation is not so simple. If the plan fails of confirmation, the bondholders will, it is true, be able to foreclose upon the Illinois-Indiana Division immediately, but if they take it in, the debt against it will be not only the whole of the present first consolidated mortgage, but what is left of the prior lien bonds together with the note secured by the pledge. The New York Central probably will, and lawfully may,

withdraw its deposit of $5,000,000, because the "Big Four" never undertook to pay the lien. That well may result in the foreclosure of the lien, and that in turn will subject the Springfield Division to the first consolidated mortgage since it covers the lien. But it is impossible now to say what in that event will be the net income of the two divisions, and how it will compare with the fixed charges. No present figures could throw any light upon that question, because the result would be a dismemberment of the system; for the New York Central could route its freight by other rails, and might do so, if the bondholders, being in possession of both divisions, would not come to terms. It is therefore not true to say that there is any assured income applicable to the first consolidated bonds upon foreclosure, which is to be used to pay junior debts. Acceptance of the plan was a question of judgment, which a majority of three-fifths might decide, § 725 (2). In fact nearly four-fifths have decided for the plan, and the minority must accede.

(8) Fulfillment of the Conditions Prescribed by § 725 of the Bankruptcy Act, 11 U.S.C.A. § 1225.

It is clear that the situation is not proper for the radical reörganization provided by § 77, 11 U.S.C.A. § 205; nobody suggests, for example, that the Peoria & Eastern should be put into the hands of trustees, which that section would require. The road is temporarily embarrassed, but no more. On the other hand, if the plan goes through, there is ground for expectation that the road will be able to meet its debts; its chief difficulty has been the maturity of the first consolidated mortgage. If that can be refinanced as here provided, there is good prospect that the road can go on, and not only serve the public, but meet its debts, as they fall due. It is not likely to become insolvent, for its earnings are more than enough to meet its fixed charges; and, so far as we can see, no future financing will be necessary which will be beyond its powers. We recognize, of course, that these conclusions are conjectural, but that is inevitable. The important fact is that the plan fends off what might very well result in the disruption of an important part of a large transportation system, and does so with proper regard for the rights of all. We have tried to exercise that independent judgment which § 725 (3) requires of us, but is is impossible not to be influenced—e. g., as to the prac-

ticability of success—by the findings of the Commission. We do not understand, however, that in this we have been delinquent; quite the contrary, we ought to give great weight to its conclusions upon matters within its expert competence, even though in the end we are indeed charged with final responsibility for the result.

The last paragraph of § 725 also requires us to approve the continuation of the existing voting rights in the Peoria & Eastern and in the way in which its directors and officers are selected. We must find that continuation "adequate, equitable. in the best interests of creditors and stockholders, and consistent with public policy". This we understand gives us a free hand in requiring the plan to give such representation as is equitable to the creditors. The income bondholders occupy much the same position as preferred shareholders, and as such they have a very lively interest in the payment of the accumulated advances. We think that they should have representation upon the road's board of directors, so that they may continually keep advised of its affairs without the mediation of a court. We cannot, however, see any advantage in giving them more than one director, and certainly it would be extremely prejudicial to give them a majority, which is what they ask in case no income is paid on the bonds for two years. That might make joint operation difficult or impossible, and failure to pay interest on these bonds is not a default at all. All they need is some one who will have the absolute right to scrutinize the road's operation, management and finances. Hence we will modify the plan by virtue of the power given us in § 721, 11 U.S.C.A. § 1221, so as to provide that the income bondholders shall have one director upon the board. This does not require resubmission to the Commission under § 721, sub. a; nor does it substantially affect the interests of any class of creditors so as to require resubmission to any of these under § 721, sub. b. The plan will therefore be modified to that extent and approved as modified.

The expenses of this proceeding are so moderate as to require no discussion.

The petitioner will submit proposed findings and conclusions and a proposed decree within five days after the filing of this opinion. The intervenors will file any supplements or amendments to these within five days thereafter.