**EWEN et al. v. PEORIA & E. RY. CO.**

District Court, S. D. New York.
April 24, 1948.
Rehearing Denied June 4, 1948.

See also 49 F.Supp. 83.

John M. Harlan, Charles S. Aronstam, Archie S. Karp, Lyman M. Tondel, Jr., and William B. Shedd, all of New York City, for Income Bondholders.

Gerald E. Dwyer and Samuel H. Hellenbrand, both of New York City, for "Central."

F. W. H. Adams and Peter Keber, both of New York City, for "Peoria."

Before L. HAND, Circuit Judge, and COXE and HINCKS, District Judges.

L. HAND, Circuit Judge.

This case has now come back to us upon objections to the report of the Master un-

der the rules.[2] On July 29, 1940, we passed a decree, Section 24 of which, as amended by our opinion on April 3, 1941, 37 F.Supp. 917, we quote in the margin.[3] Early in 1943 the "Central" filed the annual account between the roads required by Article Fourth of the Operating Agreement, to which the director of the "Peoria" who had been appointed by the Bondholders filed objections. Thereafter and on April 1, 1943, the "Central" petitioned for a supplemental order, appointing a master under this decree to hear and report upon the validity and amount of their claim against the "Peoria" in the sum of $2,485,482.58, as of December 31, 1939; and by order entered May 20, 1943, we appointed a master to conduct such an inquiry. The parties to the accounting were the "Central," a protective committee of the Income Mortgage Bondholders, and the "Peoria." On July 2, 1943, we appointed an independent attorney to represent the "Peoria" upon a petition of the "Central" with the understanding that he should "to the best of his ability as an attorney, protect the interest of the Peoria & Eastern * * * and * * * look only to the best interest of the Peoria & Eastern without regard to any * * * control," by the "Central." The Bondholders engaged a firm of accountants who were given access to the books of the "Peoria" and of the "Central," and who reported to them on June 30, 1944. This report the "Central" took some six months to prepare to meet, and the hearings began on February 2, 1945. The Master took some four thousand pages of testimony, considered nearly six hundred exhibits, and filed his report on April 28, 1947. The original claim of the "Central" had grown by the end of 1945 to $2,600,441.68; but the account as stated by the Bondholders showed not only that no part of this was due, but that there was due to the "Peoria" over $12,000,000. By consent, neither party made any effort to carry the accounting back of January 1, 1920; but the Bondholders challenge the accounts for every year thereafter until the close of the year 1945. Before taking up the several items which make up their challenge, it is necessary to consider (1) the underlying relations between the "Central" and the "Peoria" which determined their mutual rights and duties; (2) the effect of the annual statements of account of the "Central" made to the "Peoria" and to the trustees for the Bondholders; and (3) the Statute of Limitations. Throughout we shall assume an acquaintance with our earlier decisions[4]; but we will endeavor in our discussion to state of the separate items enough of the facts to make understandable what we say.

## I.

### The Duty of the "Central" to the "Peoria," and The Burden of Proof.

As we said in our original opinion, the "Central" completely dominated the "Peoria" through the ownership of a majority of its shares, and the first question is, how far as a majority shareholder, it was free to use its power over the minority and the Bondholders to its own advantage; in short, to what extent it occupied the conventional position of a fiduciary. As the Bondholders point out, the Court of Appeals of New York in Farmers' Loan & Trust Company v. New York & N. R. Company[5] and Ticonderoga R. Company v. Delaware & Hudson Company[6] was

---

[2] Rule 53(e) (2), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

[3] "Section 24. All questions concerning the amount and validity of the accounts between the 'Big Four', the New York Central Railroad Company and the Petitioner are not determined in these proceedings and are hereby specifically left open and reserved for future determination. Should the New York Central Railroad Company and/or the 'Big Four' seek or attempt, in any year or at any time or times hereafter, to withdraw any part of the earnings or assets of the Petitioner by way of recoupment or repayment of said intercompany accounts, then and in such event said New York Central Railroad Company and/or 'Big Four', upon objection by the representative of the Income Bondholders elected to the Board of Directors, must prove and establish their right to do so."

[4] Ewen v. Peoria & E. R. Company, D.C., 34 F.Supp. 332; 37 F.Supp. 917.

[5] 150 N.Y. 410, 44 N.E. 1043, 34 L.R.A. 76, 55 Am.St.Rep. 689.

[6] 204 N.Y. 588, 97 N.E. 475.

concerned with the duties imposed upon one railroad as majority shareholder of another; but we cannot find in either decision any guidance in construing the agreement of February 22, 1890, under which the "Peoria" was operated throughout the period before us. We shall assume that, as its majority shareholder, the "Central" would have been subject to the usual limitations of a trustee in any dealings between the two, had it not been for the powers granted it in the "Agreement"; but both the Bondholders and the "Peoria" concede that these to some extent modified its duty. A moment's reflection shows that if it were to be held strictly accountable as a fiduciary in the conventional sense, the "Agreement" could not have been performed at all. Both parties entered into it, because, as it recites, they thought that it would be "beneficial to the business and traffic of said railways that the same be put under one management"; and "one management" presupposed that the "Central" should have power to determine the interests of both in those mutual transactions which would constantly arise between the two. Moreover, it was apparent that those determinations could not be "beneficial" at once to the "business and traffic" of the "Central" and of the "Peoria," unless the "Central" were permitted to profit from the joint "business and traffic." Indeed there would have been no conceivable motive for its entering into the agreement at all, if it were bound to fix the terms of every transaction with an eye only to the interest of the "Peoria."

■ The law has dealt with situations in which it is understood that an agent or a trustee is to deal with his principal or beneficiary in the interest of both; and the usual solution has been to say that the fiduciary must be "fair" to the beneficiary.[7] In International Radio Tel. Co. v. Atlantic Communications Co.,[8] the Circuit Court of Appeals for the Second Circuit accepted as a test: "whether the proposition submitted would have commended itself to an independent corporation"; and that is very close to what seems to us to be the proper test, although it needs further analysis. Whatever the right rule, clearly it does not advance to a solution to say that the fiduciary must be "fair," or must not "abuse" his power, or that he shall use it as the parties "intend." Here, as so often, a court must "interpret" the words, by imputing to them that meaning which in the main it will gather from the dominant purpose of the document as a whole. When the "Central" and the "Peoria" declared their wish that both should "be put under one management," they could only have meant that the "Peoria" should be treated as though it were a division of the "Central," so far as concerned the routing of traffic, the upkeep, disposition and distribution of rolling stock, the maintenance of repair shops, engine-houses and other buildings. In short, the "Peoria" was to become part of a single railway system, operated as a constituent unit after the conventional pattern in such cases. There were advantages and disadvantages in this, the prospective balance between which seemed inducement enough to both. Implied was a duty of the "Central" not to discriminate against the "Peoria" by denying it that share of traffic which it would allocate to a wholly owned division; and implied on the other side was a surrender by the "Peoria" of any right to ask more; so much and no more was to be the general frame of their mutual relations. That does not, however, give any clue to what part of the income and of the expenses of the new system should be assigned to the "Peoria," and this is the source of most of the difficulties, because the "Peoria" did not, and could not, appear as an independent party in any of the transactions of the "Central" with third persons. The proper apportionment inevitably presupposed some hypothetical and fictitious dealings between the two, determined by the "Central" in the interest of both; and it is necessary first to decide what, if any, general principle should govern these.

■ Theoretically, the ideal principle, if only it were in practice capable of application, would be that the "Central" should not use its power to the prejudice of the

---

[7] Restatement of Agency, § 392; Restatement of Trusts, § 216(2) (e).

[8] 290 F. 698, 702.

"Peoria": That is, that it should fix the terms of any transactions between the two as though each had in fact exerted its bargaining power against the other at arm's length. Indeed, there are situations in which that can be done within a narrow margin of error. For example, an agent permitted to trade with his principal in fungibles, dealt in upon an active market, can fix with substantial accuracy the price at which the principal would buy or sell, if the two dealt at arm's length. In the case at bar, however, it must be at once admitted that in the transactions here involved, it is wholly impossible even approximately to set the terms upon which the "Central" and the "Peoria" would have agreed at arm's length. On the other hand it may in fact be possible, to set limits on either side outside of which one can say with some assurance that the parties would not have agreed at all: that is to say, that the "Peoria" would have been unwilling to accept less and would—with possible recourse to the Interstate Commerce Commission—have been successful in its refusal; and that the "Central" on the other hand would have been unwilling to give more. In other words, although it is impossible to know whether the "Central" did discharge its duty, as fiduciary, to divide the income and expenses as they would have been divided, had it and the "Peoria" traded it out against each other, it may be possible to learn whether the actual division was worse than the "Peoria" would have accepted, or could have been forced to accept. Under such a test the crucial question becomes who carries the burden of proof. If the "Peoria" carries it, it will not succeed as to a given division, unless it was outside the range we have described; if the "Central" carries it, it will not succeed unless it would have refused to deal at all on terms more favorable to the "Peoria" than those it made. Decisions such as Geddes v. Anaconda Copper Mining Company,[9] and Pepper v.

Litton[10] are quite beside the point; they dealt with occasions upon which the fiduciary—a director, or a majority shareholder—had not been authorized to deal with his principal. On the other hand, although we have not been able to find any cases which have explicitly laid down that the burden of proof is on the beneficiary, there are several in which the result appears to have depended upon just that.[11] They were situations in which the character permitted the directors to deal with the company; and in each the beneficiary failed because he had not affirmatively proved that the fiduciary had been "unfair." On this branch of the case we therefore conclude that the effect of the "Agreement" was as follows. As to the actual conduct of the business—the routing of traffic, the disposition and acquisition of plant or rolling stock, the locating of cars and all other matters of joint "management"—the "Peoria" and the Bondholders have the burden of proof to show that the "Central" managed the "Peoria" as it would not have managed a wholly-owned division of its system. As to the division of the income and expenses, the "Peoria" and the Bondholders have the burden of proof to show that, had the two roads been dealing at arm's length, the "Peoria" would not have accepted the division made. In applying this second test, it must always be assumed that management as a single system over which the "Central" has control is not to be embarrassed.

## II.

### Accounts Stated.

The "Central" insists that the Bondholders are concluded from challenging the accounts which were annually submitted by the "Central" to the "Peoria," and by both the "Central" and the "Peoria" submitted to the trustees for the Bondholders. At the end of each year, in accordance with Article Fourth of the "Agreement," which we quote in the mar-

---

[9] 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425.

[10] 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281.

[11] Goldboss v. Reimann, S.D.N.Y., 55 F.Supp. 811, affirmed on opinion below, 2 Cir., 143 F.2d 594; Spiegel v. Beacon Participations, 297 Mass. 398, 8 N.E.2d 895; Everett v. Phillips, 288 N.Y. 227, 43 N.E.2d 18; Helfman v. American Light & Traction Co., 121 N.J.Eq. 1, 187 A. 540.

gin,[12] the "Central" made up an account of the transactions between itself and the "Peoria," and submitted it to the trustees for the Bondholders and to the directors of the "Peoria"; and the directors in each case passed a resolution approving the account as rendered. The "Peoria" also submitted the accounts to the mortgage trustees of the Bondholders, who retained them without objection, though they did not formally approve them. Article Sixth of the mortgage of the "Peoria" provided, among other things, that on or before the first day of March of each year the "Peoria" should furnish the trustees with a statement of earnings and income; and, "If the trustees shall not be satisfied with said statement, or if said trustees shall be notified in writing by the holders of bonds to the amount of one-fifth of the amount outstanding that they object to the same within thirty days after the same shall have been received by the trustees, it shall be the duty of the said trustees forthwith to notify the Railway Company of such objection." The trustees had the right to inspect the books of the "Peoria" by an expert accountant, for whose services the "Peoria" would pay; and then the Article went on: "If the said difference for any reason shall not be adjusted by agreement * * * it shall be lawful for and the duty of the trustees to file a bill in equity against the Railway Company in any court of competent jurisdiction, for an account of the net earnings and income under the provisions of this mortgage, and if it shall be adjudged in such action that there are such net earnings and income available * * * then, unless the Railway Company shall, within three months after such adjudication, pay the said balance * * * such non-payment shall constitute a default in the payment of interest, for which the trustees shall be authorized to proceed under the terms of the second, third and fourth articles of this mortgage. The remedy herein provided for ascertaining the amount of the net earnings, in case of dispute, shall be exclusive of all other proceedings, actions, suits, and demands whatsoever." The Fourth Article of the mortgage provided that "No delay or omission of the trustees or of the holders of the bonds hereby secured to exercise any of the rights and powers given to them * * * by these presents, shall be held to impair or defeat said rights and powers, or any of them, or be construed or taken to be a waiver of them, or of any of them, or an acquiescence in any default upon which the same may arise."

Had the "Peoria" not been under the control of the "Central" there could have been no question that the annual rendition of these accounts and the express approval of them by the directors' resolution, would have made them accounts stated, and have concluded the "Peoria" unless it could have opened them for mistake or fraud, of which there was neither. The Bondholders answer that, since the "Peoria" was under the "domination" of the "Central," the assent of its directors was no assent at all, and that the accounts remained merely accounts rendered. That is quite untrue. The directors were the authorized representatives of the "Peoria," and there is not a tittle of evidence that they did not honestly do their duty as they understood it: that is, that they did not examine the accounts and in fact approve them. What is, however, true is that, because of their equivocal position, as directors elected by and under the "domination" of the "Central," their assent did not conclude the "Peoria" or the Bondholders, if either chose to challenge their action. The critical fact is that until they did, and unless they did, the accounts stood as accounts stated quite as though the "Central" had not "dominated" the "Peoria," and from that it follows that

---

12 "Fourth.—Within sixty days after the 31st of December, 1890, and each year thereafter, the Cleveland Co. is to make up and state all its receipts for earnings and income from the said lines of railroad operated by it under these presents, and from said purchase money lien, and all its disbursements for interest or rental as aforesaid, and for the cost and expense of using, operating and maintaining said lines of railroad and of complying with the requirements of these presents, and to render proper accounts thereof to the Peoria Co. and to the trustees of its said second mortgage as in said second mortgage required."

whatever conduct or inaction disabled either the "Peoria," or the Bondholders, from making their challenge left the accounts as accounts stated. In short, the directors' consent, though voidable, was not void. There cannot be any doubt that the Bondholders did disable themselves from making such a challenge. Their trustees had received the accounts from both the "Peoria" and the "Central" and had retained them without objection, which was quite as conclusive an assent as the formal resolutions of the directors.[13] Moreover, this is the just result, plainly forecast in the mortgage, whose draftsmen were aware that just such disputes as have now arisen might arise, and who wished to prevent their settlement being put off until the evidence, then accessible, might have disappeared. For that reason they provided the Bondholders with full opportunity of acquainting themselves with how the "Central" was discharging its duties, and gave them ample remedy for any derelictions they might discover. Moreover, this remedy was made exclusive so that the "Central" might be able to know as it went along whether it might safely continue the joint "management" in the way it had been conducting it.

The Bondholders retort that the language, which we have quoted from Article Fourth of the mortgage, protected them against their own inaction or that of their trustees; and that consequently the continued absence of objection by either was without significance or legal effect. We do not agree. The provisions of Article Fourth which preserved the "rights and powers * * * given by these presents," irrespective of inaction by the trustees or the Bondholders, was intended to apply only to rights conditioned upon a defined default, and not to incidents of the exclusive remedy provided by Article Sixth for the ascertainment of net earnings and income. This construction is suggested both by the context and content of the very clause upon which the Bondholders rely. Article Fourth, in which it occurs, confirms to the trustees and the Bondholders' rights relating to a receivership and sale of the mortgaged property; rights which by their very nature could not come into effect until after a default. Indeed, under Article First the "Peoria" as mortgagor was entitled to remain in possession until default. Again, by the very language of the clause in question the draftsman indicated his concern lest a failure to exercise their rights might be deemed "an acquiescence in any default upon which the same" (the rights) "may arise": Language plainly directed to rights dependent upon a default. Article Sixth makes it plain that the "right" to object to the annual statements of accounts—and in case of dispute to sue for an accounting—cannot constitute a "default" until entry of a judgment declaring that income additional to that originally reported is available for bond interest, and until that judgment remains unpaid for three months. Only after such a "default" are the trustees empowered to proceed under Articles Second, Third and Fourth. Articles Second and Third are expressly confined to rights arising upon default, and the fact that Article Sixth places Article Fourth in the same category tends to support this construction. Furthermore, we find some significance in the verbal distinction between the "rights and powers," which Article Fourth was solicitous to preserve, and the "remedy * * * for ascertaining the amount of the net earnings," which Article Sixth made "exclusive of all other proceedings." This distinction may possibly also explain a curious difference between the several provisions for the Bondholders' control over their trustees. Under Article Sixth, the holders of only one-fifth of the bonds may initiate the "remedy" for ascertaining the net earnings; but to compel the exercise of a "right" upon a default under Article Second, the holders of one-quarter of the bonds are required. However that

---

[13] Standard Oil Company v. Van Etten, 107 U.S. 325, 333, 334, 1 S.Ct. 178, 27 L.Ed. 319; Bonwit Teller & Co. v. United States, 283 U.S. 258, 265, 51 S.Ct. 395, 75 L.Ed. 1018; Daube v. United States, 289 U.S. 367, 370, 53 S.Ct. 597, '77 L.Ed. 1261; Boise v. Talcott, 2 Cir., 264 F. 61, 66; Leathe v. Title Guaranty Trust Co., 8 Cir., 18 F.2d 41, 49; Kretni Development Co. v. Consolidated Oil Co., 10 Cir., 74 F.2d 497, 500; Restatement of Contracts, § 422(2); Williston on Contracts, § 1863.

may be, we think it plain that the "remedy" here referred to included the procedure expressly stated in Article Sixth "for ascertaining the amount of the net earnings, in case of dispute" as well, of course, as all incidental procedural steps to that end: not until that "remedy" resulted in a judgment, followed by a "default," did the "rights and powers" referred to in Article Fourth arise.

■ The Bondholders seek to escape the effect of these provisions by saying that, although they may have lost their rights as lienors on the income, they retained them as unsecured creditors of the "Peoria"; and that, if the "Peoria" be entitled to challenge the accounts, they are entitled to their share in any funds which may come into its treasury. One answer to this is that the "Central" was itself to render the accounts to the Bondholders' trustees, whose assent made them accounts stated as between the Bondholders and itself, as much as between the "Peoria" and itself. Another answer is that it would be altogether unreasonable to confine the effect of Article Sixth to the interests of the Bondholders as lienors, for that would accomplish nothing but to deprive them of their priority over other creditors of the "Peoria." That might have been a plausible purpose—though it would not have been convincing—if there could have been other unsecured creditors; but there could not, for the "management" was to be in the hands of the "Central," and the "Central" undertook to pay, not only fixed charges and taxes, but "all claims arising out of the operation or management thereof." Thus, if, in spite of the loss of their rights as lienors, the Bondholders remained unsecured creditors to the extent of any income which the "Central" failed to pay, they would have been the only creditors, and the only difference in their rights would be that they must proceed by execution rather than by foreclosure. For the foregoing reasons we hold that, as to all questions which affected the income or expenses of the "Peoria," the accounts became accounts stated as against the Bondholders by their failure seasonably to object. The first objection made to the accounts was on February 24, 1943, and, as we have said, by the Bondholders' director; hence the Bondholders are concluded as to all net income which accrued before January 1, 1942.

■■ The "Peoria" is not so concluded, because the minority shareholders never assented to the correctness of the accounts, and the directors' assent was always open to challenge by them. It is true that they have never questioned the action of their directors, and that we have done what we could to protect them by appointing an able, assiduous and disinterested attorney for the "Peoria." Nevertheless we should be unwilling to deny them the benefit of any rulings which we make in favor of the Bondholders during the years in which the accounts are open to the Bondholders themselves, or, so far as the minority are not concluded by the Statute of Limitations, even to deny them the benefit of the same rulings back of those years. This position raises an added problem, however, in those years in which the Bondholders are concluded by the accounts stated. Should the fact that they lost the right to surcharge the accounts inure to the benefit of the "Peoria" (i. e. the minority shareholders), or to that of the "Central"? In other words, in computing the earnings properly due to the "Peoria" should the "Central" be allowed a credit in each of those years up to $160,000—four percent upon the principal of the mortgage? Article Third of the "Agreement" is the only relevant provision: the "Central" is to "receive all earnings and income" of the "Peoria" and to "apply the net earnings" first to the payment of the fixed charges, to "apply the balance * * * to the payment of interest" on the mortgage, "and pay over to the Peoria Co. any amount thereof finally remaining." That is a direction to the "Central" how to dispose of the income; and, if the Bondholders had surrendered, once and for all and in advance, a share of their right to the income— say, a fifth—it may well be that in subsequent years the "Central" would have had to distribute to the "Peoria" what was left after they had distributed four-fifths to the Bondholders. That is not what took place. In each year before 1942 the Bondholders became at once entitled to any income beyond that disclosed in the accounts up to $160,000 before anything was to go

to the "Peoria"; and that right remained unimpaired throughout that year. It was only in the subsequent year that they lost it by assenting to the correctness of the accounts; the result was not different from a formal release of the claim that had accrued against the "Central" in their favor. We cannot see why this should be treated as an assignment to the "Peoria"; nor do we discover any equity which requires the "Central" to pay to the minority shareholders sums which the "Agreement" did not intend them to have. The equities being equal, we are content to let the legal right prevail, and we hold that, before the "Peoria" becomes entitled to share in the income of any year before 1942, it must concede a debit up to the $160,000 which would have gone to the Bondholders.

### III.

### The Statute of Limitations.

 The disposition we have made of the defence of accounts stated makes it unnecessary to consider the Statute of Limitations as applied to the Bondholders. True, their trustees never objected to the accounts at any time, but we accept as an equivalent the objection on February 24, 1943, of the Bondholders' director. Since, even so, the accounting cannot go back of January 1, 1942, no question of limitation arises. Not so as to the "Peoria," whose rights it may assert on behalf of the minority. The relevant statute is that of New York,[14] and the action would be against the "Central" upon the breach of their duty to account in accordance with Article Fourth of the "Agreement." We will assume for argument that an action brought against the "Central" on an open account would require the accounting to go back to the first transactions between the parties; that is, to 1920.[15] However, for the reasons we have already given, it would be wrong to treat an action brought in the "Peoria's" name, as merely an action upon an open account; it would not become

such until the assent of the "Peoria's" directors to the correctness of the accounts was set aside. Even though we assume, as we do, that the "Peoria" may speak in the name of its minority shareholders, it must do so subject to those conditions which would have limited a shareholders' derivative suit brought in the "Peoria's" name to set aside the assent. One of those conditions would be the Statute of Limitations, the period of which the New York statute fixes at ten years in suits which, like this, must be brought in equity.[16] As we have just said, the first objection to the accounts —except for one that was later settled—was by the Bondholders' director on February 24, 1943; and that objection did not extend to the accounts for earlier years. Nevertheless, on April 1, 1943, the "Central" petitioned to be allowed to withdraw surplus income in payment of their advances, and this opened the accounts for the whole period save as they were foreclosed as accounts stated. We cannot find in the record when for the first time in the proceeding so instituted the "Peoria" explicitly challenged the accounts stated, but we assume that it was some time during 1943. Since it must have been after April 1st of that year, it was more than ten years after the account became an account stated for the year 1932. Hence it follows that the "Peoria" may insist upon a restatement of the accounts for 1933 and those which followed, so far as the accounts rendered were open to challenge on the merits.

This concludes our preliminary rulings, and we proceed to the specific items of surcharge.

### IV.

### Freight Revenues.

The first of these items is that the "Central" did not divide the freight revenues "fairly": it is in three parts, called respectively "Superimposition," "Minimums" and "Equalization." It was the general practice in the territory of the Central Freight As-

---

14 Hargadine-McKittrick Dry Goods Co. v. Hudson, 8 Cir., 122 F. 232, 234; In re German-American Improvement Company, 2 Cir., 3 F.2d 572, 575; In re Povill, 2 Cir., 105 F.2d 157; Biggs v. Mays, 8 Cir., 125 F.2d 693, 698; In re Resler, D.C., 95 F. 804; In re Stoddard

Bros. Lumber Co., D.C., 169 F. 190, 194; In re Strotz, D.C.S.D., Cal., 50 F.Supp. 322, 325.
15 New York Civil Practice Act, § 56.
16 New York Civil Practice Act, § 53; Potter v. Walker, 276 N.Y. 15, 25, 26, 11 N.E.2d 335.

322

sociation to divide joint rates between two or more carriers, in proportion to the distance over which each hauled a shipment. That applied without qualification in the case of what is known as an "overhead" carrier: i. e. one which hauls a shipment intermediately between the first or "originating" carrier and the last or "terminating" carrier. A division of the joint rate in proportion to the miles of each carrier's haul does not, however, make allowance for the cost of loading, switching, making up the train at the point of origin, or of the costs of discharge at the point of unloading. To meet these it has been long customary to compute the haul of a shipment by adding what is called "inflated mileage" at each end of the haul, and credit the "originating" and the "terminating" carrier with the addition. This is done by dividing the joint mileage into sections or "blocks," fixed by the consent of the carriers concerned. For example, if a shipment starts on Road A, passes over the rails of Roads B and C and ends on Road D, the distance which it has travelled on A and D will be divided into sections or blocks which we may call X, Y and Z, of Road A, and U, V and W, of Road D. No matter where on any block of Road A the shipment starts or ends, and no matter where on any block of Road D it ends or starts, the joint rate will be divided upon the assumption that Road A has hauled it over the whole of block X, or Y, or Z on which it has started or ended, and similarly as to Road D. True, neither Road A nor Road D will receive any return for the costs of loading or discharge, when a shipment begins to move, or comes to a stop, at the further end of a block; but as to all shipments beginning or ending in the middle of a block, it will receive a proportion of the rate increased by the number of miles of that block over which the shipment has not been hauled. By and large this is designed to make up for the extra costs of all shipments "originating" or "terminating" on that block.

It often happens, however, that this allowance is not enough. Sometimes the proportion of a joint rate, which an "orig-inating" or a "terminating" carrier will receive—even though it hauls over two blocks—will not pay it for its added costs at the beginning or end of its haul. In such cases it is the common, though not the uniform, practice to make an arbitrary allowance of twenty per cent of the joint rate to each "originating" or "terminating" carrier, if its proportion of the rate, calculated upon the end block together with any intervening blocks does not come to that much. This allowance is called a "minimum."

The "Peoria" does not join in the Bondholders' claims because its attorney does not think that the court has jurisdiction of the issue; he believes that the question of the division of a joint rate is for the Interstate Commerce Commission.[17] However, the Commission's power is confined to the division of "joint rates," appearing in "joint tariffs," and "joint tariffs" must contain the names of the participating carriers who must file their "concurrence or acceptance." The "Peoria's" name did not appear on the divisions of joint rates, nor did it figure in fact as a carrier at all; the "Central" divided the rate as though it was the carrier over the "Peoria's" rails. No doubt, the same considerations which enter into the Commission's divisions come up between the "Peoria" and the "Central"; but we are disposed to read the statute literally, as the Commission itself has done,[18] and to hold with the Master that it has no jurisdiction over the division of the "Central's" share between itself and the "Peoria."

(a) "Superimposition."

"Superimposition" is a name coined by the Bondholders to describe how the "Central" divided the proportion of joint rates which it received in cases where it was an "overhead" carrier: that is, when the shipment passed over, but did not begin or end on its own rails, but on the rails of the "Peoria." When the shipment left, or came upon, the "Peoria's" rails for, or from, those of an outside carrier the question does not arise, for the "Peoria" was

17 § 15(6), Title 49, U.S.C.A.
18 Canton R. R. Co. v. Ann Arbor R. R. Co., 163 I.C.C. 263, 265–266, 267;
New York Dock Ry. v. Baltimore & Ohio R. R. Co., 73 I.C.C. 656.

allowed the "Central's" share; but that was not the case when the "Central" hauled a shipment over its own rails as though it were an "overhead" carrier. As between itself and connecting carriers the "Central" succeeded in getting established as two blocks in the division of through rates, one block, Peoria to Danville—127 miles— and the other, Danville to Indianapolis— 85 miles—which together made up the "Peoria's" total mileage—212 miles. Thus, if a shipment began or ended between Peoria and Danville, the "Central's" share of the joint rate had a credit of 127 miles, and if between Danville and Indianapolis, of 85 miles, which the "Central" collected for itself. In accounting to the "Peoria" for the income so received the "Central" did not, however, credit it with the amounts so collected; but in place thereof it substituted what it somewhat naïvely called "Family Percentages." It divided the whole road into three blocks, of which the middle and eastern were each seventy-five miles, and the western, sixty-two; and it computed the credits to the "Peoria" for terminal shipments as though these had been the blocks on which its own share of the joint rates had been computed. The Bondholders have christened these substitutions as "superimpositions," and say that they were "unfair."

So far as we can see, the "Central" does not really seek to defend this substitution beyond suggesting that in the end things probably evened up, the "Peoria" gaining upon some shipments what it lost upon others. That however is not an answer unless the practice was defensible in itself; and if it was not, the account must be to this extent restated. The Bondholders do not question the propriety of the divisions of joint rates between the "Central" and connecting carriers, including the blocks made use of for that purpose; but they say that the "Peoria" was entitled to the same amounts which the "Central" secured by those divisions. Whether the "Family Percentages" were "fair," depends—under the standard we have set—upon whether, had the "Peoria" been negotiating divisions of

the joint rates as an independent carrier, it and the "Central" would have agreed upon the same two blocks that the "Central" and the connecting carriers had agreed upon. The Bondholders did not indeed prove that this would have been the result of free higgling between the two; but we think that, as the record stands, the evidence was strong enough to put the "Central" to a rebuttal which it did not make. It cannot deny that the blocks, as between itself and the connecting carriers, provided "fair" compensation for the added costs of handling shipments at either end of the haul; yet those costs presumably would have been no less, had the "Peoria" been an independent carrier. That being so, it is a reasonable inference that either by bargaining, or by recourse to the Commission, the "Peoria" could have secured recognition of the same blocks, had it been dealing with the "Central." Notwithstanding that upon this, as the other issues, the Bondholders have the burden of proof, we hold that the evidence supported a positive inference upon the issue.

■■■■■ Nor are we embarrassed that the Master found against the Bondholders. Into his general finding that the use of the "Family Percentages" was justified, there necessarily entered a legal standard, or "norm," and such findings do not have the protection of the rule.[19] We hold that during the years that are open—1933 to 1945 inclusive—the income of the "Peoria" must be recast so as to credit it with "inflated mileage" based upon two blocks divided at Danville; but the Bondholders will share in this only from January 1, 1942.

(b) "Minimums."

The Bondholders' claim as to "minimums" is that the "Central" could have obtained for the "Peoria" "minimums" based upon the blocks which it used, taken without including any other mileage. Ordinarily, as we have said, when a shipment passes over a whole block, and begins or ends within another block, both of the same carrier, the "minimum" is based upon the combined mileage of both blocks; it is this

19 Rule 53(e) (2); Barbarino v. Stanhope S. S. Co., 2 Cir., 151 F.2d 553, 555; Kreste v. United States, 2 Cir., 158 F.2d 575, 577; Guerrini v. United States, 2 Cir., 167 F.2d 352.

combined mileage which must fetch twenty per cent of the joint rate, whether or not the mileage of that block alone on which the shipment begins or ends fetches twenty per cent. In its divisions with connecting carriers the "Central" made no effort to secure "minimums," based upon the mileage over which shipments passed on the "Peoria's" rails, and this failure is the basis of the claim. We do not understand that the Bondholders go so far as to say that, for example, the "minimum" upon a shipment coming from east of Indianapolis and ending west of Danville ought to have been based on the block between Danville and Peoria; but it does assert that it should have been based upon the whole mileage of the "Peoria" as it would have been had the "Peoria" been independent.

There was indeed evidence that in several cases the "Central" had secured "minimums," based upon the combined mileage of a division, treated as though it were an independent carrier. Particularly striking was the case of shipments beginning or ending on the Springfield Division and passing through Cleveland; and there were other instances also. The "Central" replies that in all these cases the practice had been carried over from a time when the mileage on which the "minimum" was computed, had been that of an independent carrier which had been later consolidated with the carrier which was party to the division. That was the case with the Springfield Division, although the date at which the practice began of basing "minimums" upon that division alone is uncertain. The evidence is baffling and unreliable, and certainly before the Cleveland, Cincinnati, Chicago and St. Louis Railway Company was united with the New York Central Railroad in 1930, we should be unwarranted in saying that the first of these two roads could have secured "minimums" from the second, based upon the mileage of both blocks of the "Peoria." Moreover, the Master found otherwise. The Bondholders, however, argue that at least after 1930, when the two systems united, it must have been possible for the New York Central itself to grant such "minimums" upon hauls which began or ended on its own rails. That is of course true, but it does not follow that it became the "Central's" duty to do so. The situation thereafter can be looked at in two ways: either as though the "Central" were a single system after a merger; or as though the Cleveland, Cincinnati, Chicago and St. Louis Railway Company retained the independent existence it had had before. On the first hypothesis the "Peoria" had become functionally a division of the new system, enlarged by the addition of the New York Central Railroad, and there was no more reason to establish "minimums" upon shipments beginning or ending on its rails than there had been before 1930 on the shipments beginning or ending on the rails of the Cleveland, Cincinnati, Chicago and St. Louis Railway, which the Bondholders do not claim. On the second hypothesis, although the New York Central Railroad would be regarded as a connecting carrier (as it continued to be regarded for other rate divisions) that is a fiction which should be consistently applied; and, if so, there is no more reason for saying that it would have conceded "minimums" upon shipments beginning or ending on its rails, than before 1930. On no theory did the Bondholders prove that the "Central" was negligent in failing to get "minimums." Finally, there is a clear distinction between "minimums" and "superimpositions," for the claim to the second is for the revenues which the "Central" actually received.

(c) "Equalization."

"Equalization" is another word, coined by the Bondholders to describe the following situation and their proposed remedy for it. It applies for the most part, if not altogether, to shipments originating on the "Peoria," and bound over the "Central's" rails to a connecting carrier. It often happened that, if these shipments had left the "Peoria's" rails for an immediate connecting carrier's, the "Peoria's" share of the joint rate would have been larger than when they went first over the "Central's" rails, and thence to those of connecting carriers. The "Central" routed all shipments (so far as it could, for the last word is always the shipper's) over as much of its own rails as it could, since that brings in the largest income to the system as a

whole. The Bondholders do not complain of this; they agree that the "Central" was free to route shipments so as to get the most return; but they do complain that it was not free to do this at the "Peoria's" expense. By "Equalization" they mean a surcharge in the accounts which shall return to the "Peoria" those parts of the joint rates which it would have got, had the shipments been routed as the "Peoria's" traffic manager, acting as the agent of an independent carrier, would have routed them.

■ The claim would in any event be practically extremely difficult, if not impossible, to liquidate, because no one can now say how many of the shipments in question the shipper would not independently have routed just as they were in fact routed. However, the claim is invalid anyway; for once it be conceded that the "Agreement" authorized the "Central" to route the shipments with an eye to the interest of the system as a whole, the rest follows. If we assume that the "Family Percentages" have been corrected, the "Peoria" will have got its proper share of the joint rate over the route actually used. If it was not a breach of the "Agreement" to choose that route, there was no breach of any kind; and, if the "Peoria" is to recover more it can only be through an implied promise, to add an imputed income calculated upon income never earned at all. There is no possible basis for such a promise; on the contrary, whatever the financial incidents of a choice of routes consequent upon unitary operation, the "Agreement" included them; for it did not deny to the "Central" any part of the profit whose prospect had determined its choice of routes. The tail went with the hide.

(d) *Grain.*

These claims are in the same class as other "equalization" claims with one exception—"Grain Transited at Indianapolis and Reshipped to Chicago." Disregarding this for the moment, the practices complained of were reasonable, viewed from the interest of the "Central" although they did not result in that profit to the "Peoria" which, we will assume for argument, it could have made, had it been acting inde-

pendently. Yet, once more, all that the "Peoria" may demand was that the "Central" should treat it in the same way that it would, had it been a wholly owned division.

■ The claim for "Grain Transited at Indianapolis and Reshipped to Chicago" stands on a different footing. The "Peoria's" share of the rate was fixed subject to an agreement between the "Central" and the Illinois Central Railroad, going back of 1890; and, in spite of the "Central" privilege to treat the "Peoria" as a wholly owned division, the single "management" authorized did not include allowances against the "Peoria" for payments to which the "Central" for its own purposes had previously committed itself. On the contrary, "management" is to be understood as usual or standard management. Indeed, neither the "Central" nor the Master, seem to defend these charges.

(e) *Coal.*

The Bondholders complain that the "Peoria" was not properly credited for the coal coming from mines lying to the southeast, which was paid for on the basis of the "Family Percentages." The accounts would of course have to be restated like those for other merchandise, if is appeared that the joint rates on coal had been divided in the same way as the rates on merchandise. That does not appear; because of the loss of the "authority files" it is impossible to know on what basis the joint rates on coal were in fact divided, and the record is bare of any evidence showing that the "Peoria" was deprived of what it could have obtained as a connecting carrier. Here as elsewhere the burden of proof was upon it, nor can we use the disappearance of the "authority files" to throw any presumption upon the "Central."

■ The Bondholders seek to supply this absence of evidence as follows. The "Central" received for coal delivered by it at Indianapolis the same sum in dollars that it took upon coal passed to the "Peoria" rails at Indianapolis. If it was content with that division for coal delivered at Indianapolis, it must have been overpaid upon that which it passed to the "Peoria,"

for the cost of terminating a shipment is substantial. Hence it follows that on coal passed to the "Peoria" it got too much. This might be difficult to answer, if we knew that the "Central's" terminal costs upon Indianapolis deliveries were not made up in some other way; but we do not. So far as the record shows, Indianapolis may have been the far end of a block, in which event terminal costs would not have been allowed, being "absorbed" by the "inflated mileage" allowed upon shipments delivered at eastern points upon that block.

The Master found the evidence too uncertain for any conclusion that the "Peoria" had not been "fairly" treated; and we should not be warranted in saying that this was "clearly erroneous."

## V.

### Traffic Expenses.

The Bondholders challenge the "Central's" charge against the "Peoria" for traffic expenses upon the ground that it had been a faithless fiduciary, and as such is not entitled even to its expenses. It is true that a fiduciary may not be paid for services in whose discharge he has been disloyal; and at times, if his conduct has been wilful and deliberate, he may even forfeit all compensation;[20] but it is at least doubtful whether in any circumstances he will lose his right to indemnity for any expenses which have actually benefited the beneficiary,[21] though of course the beneficiary may set off against these any loss that he has suffered.[22] That the traffic expenses were to some extent beneficial to the "Peoria" goes without saying; on the other hand the "Central's" conduct might have shown such a wanton disregard for the "Peoria's" interest that the burden would rest upon it to single out that part of the expenses which were a benefit; and since it has not done so, it might be allowed no expenses. At least that is the most plausible argument for this extreme result. Be that as it may, we agree with the Master that the claim

based upon supposed misconduct "is entirely without substance." True, the "Central" did not credit the "Peoria" with all the income that at the end of this exhaustive inquiry we have concluded was its due; but the Master, in a report of unrivalled care and acumen, exonerated it in all but a few details and those ancient ones. We can find no justification for saying that it ever deliberately tried to despoil the "Peoria"; or that the matters with which we do charge it show evidence of any corrupt purpose. The "Agreement" put it, and was deliberately meant to put it, in an equivocal position; it was to serve two masters; and on the whole it acquitted itself creditably in a long series of extremely complicated transactions. To deny it its proper expenses would be to the last degree unjust.

There is however one specific correction which must be made. Until January 1, 1935, the "Peoria" was charged with the whole expense of the agencies maintained not only at Indianapolis and Peoria, but at Pittsburgh and Minneapolis. This was clearly "unfair," and indeed, so far as concerned the last two, it was the most indefensible act in the whole of the "Central's" conduct. The Master held that, except for the Statute of Limitations, the account would have had to be restated and these charges prorated as the other expenses were prorated. We agree; but, since even for the minority shareholders we go back only to January 1, 1933, the restatement will be confined to 1933 and 1934.

## VI.

### Harrisburg Coal.

This claim rests upon the argument that it was "unfair" to the "Peoria" to impose upon it the carriage of coal from the Harrisburg region which the "Central" found it to its interest to haul at a loss. As appears in the footnote, if the Master's findings are right, the traffic was not carried at an actual "out of pocket" loss; at worst it became a loss only after fixed charges and perhaps upkeep were deduct-

---

[20] Restatement of Agency, § 469.
[21] Restatement of Agency, § 439(e).

[22] Restatement of Trusts, § 244.

ed.[23] The Bondholders say that, although it may have been proper enough for the "Central" to accept the shipments for the sake of the indirect advantages that would come to it, it was not entitled to put off such burdens on the "Peoria." This is the same argument that they used as to "Equalization"; and it equally disregards the purpose of the "Agreement." The "Peoria" had embarked in the same ship with the "Central" on a voyage which was in fact not to end for seventy years, and during that period their fate was to be one. What was good for the system was by hypothesis good for both; the advantages could not be separated.

Indeed, it does not certainly appear that, had the "Peoria" been independent, it would not have accepted the same traffic at the same loss. It had been an unsuccessful road, ending in bankruptcy; what would have been its bargaining power against the "Central," and whether it might not have found it desirable to accept some traffic at a loss in the hope of advantages to come, who can say?

## VII.

### Freight Car Hire.

The background of this claim, which the Master has well sketched, is the complicated pattern of railroad practice as to the interchange of freight cars and charges for the use and handling of foreign cars. For each foreign car on its rails each railroad pays a rental charge which, being computed on a daily basis, is called a "per diem." This is designed to pay the owning railroad for the cost of ownership without allowance for profit; and during the period here involved the charge was $1.00 per day. Copies of interchange and junction reports are furnished each owning and using railroad, showing when each car passes from the rails of one to another; the balances, on monthly reports showing how many days

each foreign car has been on the rails of each railroad, are settled by payments. The liability for "per diems" extends even to all home-bound empty cars, thus furnishing incentive for their prompt return to their owners. Home-bound "empties" are of two classes: (1) Those which return by the same route they followed in their out-bound movement under load, and which are said to have "record rights" over each railroad participating in the movement under load, and (2) those which return over a railroad which had no part in the movement, and hence in the revenue, of the movement under load, which are said to be "out-of-route," or without "record rights." Each railroad is required without direct compensation for the service to receive at any junction on its lines all returning "empties" which have "record rights," and to move them along their homeward journey, paying "per diems" on them. However, a railroad is not obliged to accept "out-of-route" "empties"; nevertheless, if it does, it makes itself liable for "per diems," though it is paid by a haulage fee usually of six cents a mile.

Within the "Central's" system, each component division was treated as a separate entity as to interchange reports and "per diems." Thus the "Peoria" paid "per diems" to the "Central" for system (other than "Peoria") cars on its rails and the "Central" paid the "Peoria" for "Peoria's" cars on system (other than "Peoria") rails. As the Master recognized, the general arrangement obtaining under the "Agreement" was such that the "Central" had both opportunity and incentive to shunt to the "Peoria" a part of the cost of its own freight car hire. For example, in slack seasons when the "Central's" supply of freight cars exceeded its needs it was possible by an abuse of its managerial power over the "Peoria" to store its cars on "Peoria" rails longer than necessary, and

---

23 Gross revenue per ton mile—3.26 mills.
Deducting Peoria switching charges, charges due other roads and per diems, the net revenue is 2.18 mills per ton mile.
Average cost per ton mile
 (all freight) 2.50
Less Danville switching 24 .425

24 This item was not shown to have been absorbed by the "Peoria."
Net cost per ton mile 2.075
Less 4% saving for heavy
 freight .083
Corrected cost per ton mile 1.992 mills.
 Net revenue 2.18
 Net cost 1.992
 Net gain .188 mills.

to make the "Peoria" an involuntary bailee paying "per diems" on cars, for which neither "Peoria" or the "Central" had any immediate need. On the other hand, efficient management would often make it uneconomical to move system cars off the "Peoria's" rails, until it was known where they would be needed; for such movements obviously might result in waste motion. To reconcile economical operation of the system as a whole with the rights of the "Peoria" security holders the "Central" devised a storage arrangement by which in slack seasons the "Peoria" was allowed credits known as "reclaims," also computed at the rate of $1.00 per day, per car, which retroactively cancelled out all "per diems" on system "empties" which had been on the "Peoria" rails over three days. It is this arrangement, though born of solicitude for the "Peoria's" rights and within the system applied only to the "Peoria," which is at the bottom of the Bondholders' claim of excessive car hire.

First it is objected that the storage arrangement was "unfair" in that the "Peoria" station masters for whose shortcomings the "Central" was legally responsible, often neglected to make the so-called "Form B" reports, with the result that "reclaims" even when allowable were not recorded and credited. In support of this charge, the Bondholders rely in part on a report made by a "Central" official named Bowen, who, when assigned to the service of the "Peoria" in 1935, made a report showing that in the first ten months of that year allowable "reclaims" aggregating $23,000 had not been credited. However, promptly upon the submission of Bowen's report these credits were allowed, and that episode, without more, is not adequate basis for an inference that at other times the agents were guilty of laxity which escaped the scrutiny and correction of supervising officials such as Bowen.

The Bondholders' claim is also based upon a study made for purposes of this controversy by their expert, Eppler. This study, it is true, showed that in January, 1940, some 492 system "empties" were handled by the "Peoria" for which it was charged "per diems" without offsetting "reclaims" credited in that month. There

was, however, evidence that these charges were offset by credits allowed, which did not appear in the books until the following March. The Master took this evidence as sufficient to vindicate the "Central" as to that item. This evidence was plausible and we cannot say that his conclusion was "clearly erroneous." The evidence disclosed a similar situation for January, 1942, which he similarly disposed of; and there was no other evidence of any specific instance in which allowable "reclaims" had been lost to the "Peoria" either because of laxity of personnel in making the required storage reports, or because of refusal to grant the credits when reported.

The Bondholders next attack the basis for the allowance of "reclaims" because they were allowed only when the "Central's" manager of freight transportation determined that there was a surplus of cars. Obviously, that was not inherently unfair; for during seasons of car shortage, when the management was pressed to find enough cars to handle its business, it was hardly likely that it would cut off its nose to spite its face by storing its cars on the "Peoria" even though it received "per diems." Only in times of car surplus did the "Peoria" have practical need for protection from possible abuse of the "Central's" power; and there was no evidence of any such abuse by freight managers who falsely or capriciously denied that what was in fact a season of surplus, was one.

Equally untenable is the Bondholders' criticism of that feature of the storage arrangement whereby the "reclaims" were limited to "empties" which had been on the "Peoria' rails for over three days. Their position is that no charge at all should result to the "Peoria" on system "empties"— even those which were on its rails for three days or less. The reasonableness of this contention is neither self-demonstrative nor actually demonstrated. Even with respect to times when there were surplus cars, there is no evidence, either that the "Central" went to the trouble or expense of hauling un-needed "empties" on to the "Peoria" rails or that system cars, before or after loading or unloading on "Peoria" rails, were detained for two or three days without regard for the "Peoria's" needs, in

order to furnish a basis for "per diems," or otherwise for the "Central's" convenience. So far as appears, even in times of car surplus the availability of some such cars may have been of benefit to the "Peoria": if there were times, when notwithstanding its own meagre ownership of cars, the "Peoria" had no need for system cars, there was no evidence that three days was on the average an excessive time for their removal under reasonably efficient management.

Somewhat more plausible is the complaint as to home-bound "out-of-route" system "empties" handled by the "Peoria." The point is illustrated by the Eppler study for January, 1940, mentioned above, which showed 492 "empties" on the "Peoria" rails in that month, none of which, before or after their detainer, were used in the service of the "Peoria." At first glance it would seem unfair that the "Peoria" should be saddled with the cost of handling such cars or that it should be liable for their storage on the "Peoria" rails even for three days. Beyond dispute, such a burden on the "Peoria" was of substantial dimensions and was one that if independent it could have escaped. But, as the Master observed, under joint operation the "Peoria" enjoyed certain compensations which worked to offset that burden. For instance, the "Central" paid the "Peoria" "per diems" on the "Peoria" "empties" which it hauled "out-of-route," and made no haulage charge for such service. And much more important, under joint operation the "Peoria" was not called upon to handle at all many system cars having "record rights" over the "Peoria," which if the "Peoria" had been independent would normally have been returned only at a "Peoria" junction. This is so because under joint operation the "Central" surrendered the right, which it had theretofore enjoyed, to refuse to accept for free haulage cars having "record rights" over the "Peoria"; consequently such cars could be returned at any system junction as well as to the "Peoria." Thus, during January, 1940, when the "Peoria" handled the 492 system "empties" without pay, an even greater number of system cars having "record rights" over the "Peoria" were returned via other routes, exonerating the "Peoria" from all charges and costs, for which, if independent, it would probably have been liable.

To be sure, the evidence does not go so far as to show the amount of these compensatory factors or of any others; but on the other hand there is a similar dearth of evidence as to the expense falling upon the "Peoria' under joint operation which it would have escaped if independent. The quantities on both sides of the ledger are undetermined and on the existing record are undeterminable. With the proofs in such a state it cannot be said that the Bondholders have sustained the burden of proving a breach of duty by the "Central" in this regard.

Careful consideration of the evidence and argument of the Bondholders cannot serve to alter this conclusion. It is true that there was written evidence that in 1935 Jackson, then the "Central's" superintendent of car service, and as such an accounting rather than an operating officer, had some feeling that the "Peoria" was entitled to be relieved of all "per diems" on "out-of-route" system "empties," irrespective of the duration of their storage on the "Peoria" rails. Apparently he perceived that under the "Central's" Home Route Circular which was issued in May, 1935, the "Peoria" would be required to receive "out-of-route" system "empties," but for aught that appears, he wholly failed either to perceive or consider the compensatory features of joint operation. In any event, opinions expressed in 1935 and arrangements temporarily resulting from them, which were not repeated or justified in 1946 when the witness was under examination in an adversary proceeding, were certainly not binding on the Master or the court, and are not of controlling weight.

Nor is our conclusion at variance with the effect of the Bowen report of 1935 pursuant to which the "Peoria's" storage credit for a ten months' period was increased by $23,000. We agree with the Master that it is impossible to find from the evidence upon what basis that adjustment was made: certainly it was in large part a correction to credit "reclaims" previously unreported through inadvertence.

**330**

We cannot view it, however, as an admission that throughout the relevant period it was unfair to charge the "Peoria" with "per diems" on cars detained on the "Peoria" rails for not over three days; still less as an admission of controlling weight on the ultimate issue.

The Bondholders' claims directed particularly to the allegedly excessive charges for car hire in 1924 and 1925 are foreclosed by the accounts stated; and such claims would not be available to the minority shareholders because of the Statute of Limitations. That is so, quite apart from the fact that counsel for the "Peoria" makes no claim of any kind for excessive charges for car hire.

On their brief, the Bondholders seem not to pursue their claim of unwarranted storage charges against the "Peoria" on account of system cars while being repaired in its Urbana shop, or of system "empties" stored at Indianapolis or Danville. In any event, the claims as to those items, if not abandoned, are overruled. We find nothing in the record which would justify us in disturbing the Master's conclusions on these points. Indeed, our ruling as to the burden of proof is decisive here.

### VIII.

#### Equipment Repair Costs.

From 1921 to 1942 the "Central" charged the "Peoria" $3,610,897.01 for freight car repairs. The Bondholders point to the fact that this figure exceeded by $1,123,452 the average for all Class 1 Railroads on a per car basis, without further reference to specific figures they claim that the "Central" has failed to justify its charges. The claim is apparently predicated upon that covenant of the "Agreement" under which the "Central" was to "keep up and maintain all said * * * line of railroad and all said rolling stock and equipment in good working order, and restore and renew all parts thereof as may be necessary to that end." This covenant of course imposed a duty upon the "Central" to do the repair work now in question with reasonable efficiency, but the burden of proving a breach was on the Bondholders; and they have failed to carry it. Indeed, they

expressly conceded that, "because of the unavailability of detailed records," they "were unable even to approximate the extent" of a proper surcharge. Except for the year 1942, our holding as to the finality of the accounts would alone be a defence; and, incidentally, if the dearth of evidence is due to the loss of the "Central's" records, it confirms the wisdom of the mortgage draftsman and the inherent justice of foreclosing those who for so long assented to the correctness of the transactions recorded.

### IX.

#### Demolition of Moorefield Terminal.

The Bondholders assert that the accounts should be recast to charge the "Central" with $240,000, the difference between the estimated cost of replacing an engine terminal at Moorefield and the cost of repairing it in the year it was abandoned. This was originally built in 1889 at a cost of $41,831; and by 1934 had become obsolete. The engine stalls were too small for the locomotives then in use, and a public street prevented their enlargement which would in any event have involved expensive changes in the water station and coal dock. For these reasons in 1934 the upkeep and repair of the "Peoria" locomotives was transferred to "Central" shops, resulting in improved service at less expense; and in 1941 the old terminal was demolished, and no substitute has as yet been either needed or provided.

The "Agreement" does not expressly require the "Central" to keep up all existing buildings; nor do we think that the promise "to restore and renew" bound the "Central" to build a new terminal on the "Peoria" line, if it was not practically feasible to enlarge the old one. Article Third of the "Agreement" treats the cost of "reasonable betterments" as an expense to be borne, it is true, by the "Central" in the first instance, but recoverable out of net earnings if, and as, any such should accrue.

However, it is not necessary now to decide these questions. For until the responsibility for operation reverts to the

"Peoria" it can suffer no damage from demolition of this obsolete engine house; not until then will it be known what will be its needs upon resumption of operations. Not until then will it be faced with a predicament analogous to that of the Old Colony in the New Haven reorganization proceedings.[25] Even without applying the rule of accounts stated, no case was made as to this item.

### X, XI and XII.

Intercompany Sales of Rolling Stock.

Both the Bondholders and the "Peoria" challenge the Master's conclusions that the "Peoria" has been charged with no more than fair prices in its purchases from the "Central" of certain rolling stock. All of this equipment was sold before 1942; and it follows that the accounts bar any claim by the Bondholders. However, if the claims are allowable on the merits, in so far as they are not barred by the Statute of Limitations our earlier ruling would allow them in favor of minority stockholders. We proceed, therefore, to a consideration of their substance.

The "Peoria" suggests that these transactions, which were sales by subsidiaries of the "Central" to the "Peoria"—because they were not required or contemplated by the "Agreement"—are to be tested by a stricter standard than that governing transactions covered by the "Agreement"; i.e. by the rule of Geddes v. Anaconda Copper Mining Co., supra.[26] and Cheerob, Inc., v. Barrett.[27] On the contrary we think it fairly inferrable that the reorganization of 1890 regarded it as one of the economies of joint operation that, when the "Peoria" needed additional rolling stock, second-hand equipment might be sold to the "Peoria," when it had become less serviceable for use where it was than it would be when sold. That appears to us to be a legitimate incidence of the joint management which was the prime purpose of the whole enterprise. We hold, therefore, that as to these sales there is no occasion to deviate from the standard which we laid down earlier, or to shift the burden of proof.

Coming then to the substance of these claims, we find sufficient support for the Master's findings of fact. Of the locomotives, thirty-four were sold at prices based on depreciated ledger values, six at prices based on depreciated ledger values less an allowance for run-out repairs, five at prices based on the approximate depreciated ledger values and eleven at prices based on scrap value. In this connection it is not necessary for us to decide whether reproduction cost less depreciation should have been used as the principal factor of valuation instead of depreciated ledger value, because, as the Master found, the use of reproduction cost less depreciation at rates authorized by the Interstate Commerce Commission even with deduction for the cost of run-out repairs, would have resulted in a higher sales price than that actually adopted. It is true that the bondholders presented plausible expert testimony tending to show that the actual sales price had been somewhat excessive. But this testimony was based upon a highly complicated formula which had been developed by an expert when engaged as a locomotive sales engineer, and which had never been tested in actual practice by any railroad. The Master's preference for a more familiar basis of valuation has solid support in the record. We affirm his conclusion that an excessive price has not been proved.

In fixing the price of the sale of the 417 box cars and fifty hopper cars the "Central" was not precluded from using as a basis, cost less depreciation at 3%, with a thirty-year life and a 10% salvage value, merely because the depreciation had been accrued on its books at a somewhat higher rate. The earlier treatment of similar inter-company transactions which fixed the price on another basis does not show that the Master's findings were "clearly erroneous." Moreover, the selection of a higher

---

25 Old Colony R. Co. v. New York, N. H. & H. R. Co., 2 Cir., 98 F.2d 670, reversed on grounds not relevant here, 305 U.S. 578, 59 S.Ct. 647, 83 L.Ed. 364.

26 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425.

27 293 N.Y. 442, 57 N.E.2d 825.

depreciation rate was apparently based upon inadequate experience, and is entitled to little weight, after later experience had justified that lower rate on which the actual sale price was computed. After thoughtful evaluation of a mass of conflicting evidence the Master was particularly impressed with the weight and the validity for present purposes of a rate of 2.6% recently adopted by the Arbitration Committee of the Association of American Railroads. We confirm that view.

As to the fifty hopper cars the alternative claim, advanced by the counsel for the "Peoria," is barred by the ten-year Statute of Limitations: for the transaction in question took place in 1924. Of the nine passenger cars involved seven were sold before 1932, and the claim is barred under the Statute of Limitations. The remaining two, sold in 1938 on a basis of depreciated ledger value, do appear to have been sold at prices computed at an inadequate rate of depreciation; and the Master's finding of a thirty-year life for these cars was sufficiently supported. It follows, therefore, that these two sales should be recomputed and the accounts recast accordingly: attributing to these cars a thirty-year life (with the 10% salvage value which we take to be implicit in the Master's finding). We note that as to this item there was no evidence of value based upon reproduction cost; but that does not require that the record of fact be reopened: the parties have all had their day in court.

Lastly, except for credits aggregating $7,459.98 which the "Central" concedes, and except for a claimed overcharge of $144.04 in a Post Office car which, like the Master, we view as "de minimis," the "Peoria" objects to sales of seven gondola cars in 1940 and 1941; and for each it claims a credit of about $300. These were sold for conversion into flat cars, and, although the cost of conversion was far higher than originally estimated, the Master apparently found no evidence that the basic sale price was excessive. The mere fact that the eventual cost of conversion was greater than anticipated is not enough to constitute a breach of the "Agreement." We confirm the Master's report on this item also.

## XIII.

### Indianapolis Trackage Agreements.

For the complicated facts upon which this claim depends we refer to the Master's report. The Bondholders say that the trackage agreement of 1932 was a definitive contract, relating to the exchange of trackage rights east of the I. J. Tower, and that the consideration for what the "Peoria" got was to be what it then gave and nothing more. Hence, when the "Central" made the contract of 1940—"as of" 1936—it disregarded this original agreement, treating it as tentative, or only a negotiation. Thus they conclude that the "Central" exacted from the "Peoria" the trackage rights from the Brant Tower to the I. J. Tower, for which it gave nothing at all, and that this was bare-faced spoliation. We will not decide this issue as things stand, for we agree with the Master that it involves something over which the Interstate Commerce Commission has exclusive jurisdiction. The Commission's order on April 8, 1940, granting a certificate of convenience and necessity for the exchange of trackage rights, expressly incorporated "the terms and conditions set forth" in its report; and the report described just what was to be exchanged and on what terms the tracks were to be used. In Transit Commission v. United States,[28] the Supreme Court held that a trackage agreement between carriers was as much within the jurisdiction of the Commission as the construction of new tracks. Congress intended to "confer upon the commission plenary power to limit interstate carriers' expenditure for construction or operation to lines of railroad reasonably necessary for the service of the public," and there was "no room for a distinction between unjustifiable expenditures for the construction or operation of new mileage, on the one hand and inadequate rentals or extortionate exactions under trackage agreements on the other" (289 U.S. at page

[28] 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075.

128, 53 S.Ct. at page 538, 77 L.Ed. 1075). In a case closely akin—though it arose under another statute passed after the trackage agreement of 1940 had been made—Douglas, J., in speaking of the language we have just quoted, said:[29] "Those questions intimately relate to the financial strength of carriers. And it is one of the Commission's high functions to protect the public interest against unfair or oppressive financial practices. * * * That policy would be undermined if the carriers could repair to courts for determination of the conditions under which trackage rights could be secured."

In the light of these decisions it is of no moment now whether the Commission in fact considered the fairness of the agreement of 1940; particularly whether the "Peoria" received any consideration for the added trackage rights which it gave in that year. Arguendo, we will assume that it may have known nothing about the earlier transaction; indeed, this seems not impossible, for the "Peoria" was apparently not independently represented. The important thing is that the Commission issued the certificate for that exchange of trackage which was before it for approval and for no other exchange; and that that exchange involved precisely those "terms and conditions" which it did involve and no other "terms and conditions." If we were to hold that the "Central" must make the added payment which the Bondholders demand, we should vary those "terms and conditions," and that would be in effect to issue a different certificate. That we must not do—as little when the amount involved is small as when it is large—for all such questions are for the Commission. Recourse must be had to it, and it is premature to try now to declare what if any questions will be within our jurisdiction, should it issue another certificate. The case will be held open, if any party in interest wishes to seek the action of that tribunal.

## XIV.

### Claimed Adjustments Under the Indianapolis Trackage Contracts.

Notwithstanding our lack of jurisdiction to pass on the validity of the trackage agreements, we have, however, jurisdiction to decide any claims made under them, assuming that they remain unchanged. The Bondholders have made claims under the 1940 agreement, and the "Peoria" has made them under the 1932 agreement. Apparently through inadvertence the accounts had been cast without including any items under the 1940 agreement; and when this appeared at the hearings the Bondholders asked the "Central" to submit a statement showing what adjustments were necessary to give effect to that agreement. Before the hearings closed the "Central" did present such a statement covering the years 1936 to 1942; but it showed a balance of $19,312.22 in favor of the "Central" This the Bondholders attack, principally because it was based upon a wheelage study made in 1923 which had become stale. The Master, pointing to the lessened uses by the "Peoria" of the trackage in question, agreed that the study was stale, and recommended that for future accounts a new study be made; but he refused to give any effect to it retroactively, when it is made. However, as we understand his ruling, he recommends that the "Central" be allowed the entire balance shown in the actual statement submitted to him.

That statement was a charge against the "Peoria," composed of an item of rental for its use of the tracks, together with its proportion of the costs of upkeep, taxes and other outlays, all based on the stale study. Apparently, as we have said, the "Central's" omission to include the charges so resulting in its annual accounts with the "Peoria" was inadvertent; and it has been well-settled law from the beginning that the conclusiveness of an account stated yields pro tanto to mistakes.[30] How-

---

[29] Thompson v. Texas-Mexican Ry. Co., 328 U.S. 134, 148, 66 S.Ct. 937, 945, 90 L.Ed. 1132.

[30] Perkins v. Hart, 11 Wheat. 237, 256, 6 L.Ed. 463; Standard Oil Company v. VanEtten, supra, 107 U.S. 325, 332, 1 S.Ct. 178, 27 L.Ed. 319.

ever, although the "Central" was for this reason not bound by the omission, as a fiduciary of the "Peoria" it had the burden of proof, at least as to all items of charge;[31] and that burden it did try to carry by the use of the stale study of 1923. When that study was rejected as a basis, it had not proved the issue at all, so that the record, as it stands, does not support any claim against the "Peoria." This result is entirely consistent with our imposing the burden of proof upon the Bondholders and the "Peoria" in those cases where we have done so; for these were instances in which their claims were conditional upon some breach of the "Agreement," which is not true as to the trackage agreement. Thus, although we agree that the Master was right in refusing to extend the hearings so as to allow the preparation of a new statement, we think that he was wrong in allowing any credit to the "Central" under the one which it submitted.

The "Peoria," through its counsel appointed by the Court, has not joined in the requested adjustment under the 1940 trackage agreement. It has, however, claimed that the accounts should be corrected to surcharge the "Central" with a loss to the "Peoria" of $20,560 under the 1932 agreement—this on the theory that that agreement must be treated as an independent, self-contained transaction. Whether or not this falls within the jurisdictional point we have disposed of under Point XIII, the claim is foreclosed by our ruling that the ten-year Statute of Limitations is applicable.

## XV.

### The Champaign Grain Elevator.

This item, pressed both by the Bondholders and the "Peoria," relates to a sale by the "Central" to the "Peoria" in 1916 and entered in the accounts of that year. It is foreclosed by our rulings upon the accounts stated and the Statute of Limitations.

## XVI.

### Peoria and Pekin Switching Charges.

This item depends upon the interpretation of a number of baffling documents, cast in the elliptical language of railroads, whose meaning is either completely unintelligible to laymen or can only be vaguely guessed. Texas & Pacific v. American Tie & Timber Co.[32] first laid it down that documents, written in such terminology may be so obscure as to demand an acquaintance with the idiom of the calling and its practices and conventions, which are beyond the reach of courts. In that case the Court held that such an occasion arose when the question was whether railway ties fell within the classification of "Lumber" in a rate schedule. Another instance was Standard Oil Co. v. United States,[33] where a shipper argued that a shipment of petroleum products did not come within the tariff which the carrier had in fact used, because there were other and specific rates, "taking precedence which were lower and should have been applied." (283 U.S. at page 237, 51 S.Ct. at page 430, 75 L.Ed. 999). The Court held that the district court had no jurisdiction to review a ruling of the Commission that the products were subject to the tariff used, because the interpretation of the documents was for the Commission and was not a question of "law." In Davis v. Age-Herald Pub. Company,[34] the Fifth Circuit similarily held conclusive a ruling of the Commission that "printing paper" did not include "newsprint paper"; and in Norge Corporation v. Long Island R. Co.,[35] the Second Circuit decided that it was a question for the Commission which of several classes in a rate schedule applied to refrigerators. It is true that the words of a railway tariff do not inevitably demand recourse to the Commission. Great Northern R. Co. v. Merchants Elevator Company[36] was such a case; it held that a court might decide for itself whether "disposition orders" included orders "by way of

---

31 Wootton Land & Fuel Co. v. Owdbey, 8 Cir., 265 F. 91, 99; Judson v. Buckley, 2 Cir., 130 F.2d 174, 183; Garrett v. First Nat. Bank & Trust Co., 5 Cir., 153 F.2d 289, 292.

32 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255.

33 283 U.S. 235, 51 S.Ct. 429, 75 L.Ed. 999.

34 293 F. 591.

35 77 F.2d 312.

36 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943.

reconsignment to another destination," (259 U.S. at page 289, 42 S.Ct. at page 478, 66 L. Ed. 943), for the meaning of the words was apparent without the background of specialized experience. Nevertheless, Brandeis, J., recognized the doctrine in the following passage or his opinion: "Where the document to be construed is a tariff of an interstate carrier, and before it can be construed it is necessary to determine upon evidence, the peculiar meaning of the words or the existence of incidents alleged to be attached by usage to the transaction, the preliminary determination must be made by the Commission." (259 U.S. at page 292, 42 S.Ct. at page 479, 66 L.Ed. 943).

In considering whether the interpretation of these documents is for the Commission we start with "Division Sheet No. 162" which, as we understand it, all agree to have spread the switching charges over all parties to the joint rate in proportion to the mileage of each. That was in 1916, and there had been a number of earlier division sheets of other roads which had recognized the practice. "Amendment 86" was issued by the Joint Rate Committee to take effect January 1, 1917, and, although its chief purpose appears to have been to fix the amount of the charges, at its bottom is a passage which at least suggests that these were to be prorated. "Division Sheet I–A" was issued by the Railway Administration in 1919; it declared that the "allowances specified are to be made out of Federal controlled lines"; and this too seems at least to presuppose prorating the switching charges. The "Supplements" to "Division Sheet I–A" issued before "Supplement No. 7" are not important; and at any rate they did not weaken the force of the argument, which arguendo we shall accept, that up to 1922, when "Supplement No. 7" was issued by the two local roads, the tariffs contemplated prorating the charges. That "Supplement" did expressly "cancel" "Division Sheet I–A and Supplements," and the Master found that it also cancelled all authority for prorating the charges. The expert for the Bondholders believed that its effect was limited to cancelling the existing schedule of charges. He could find no documentary evidence in the "Central's" files to indicate that the practice of prorating

had changed, and he thought that the former documentary warrant for it remained. The expert for the "Central" thought otherwise; and the Master apparently preferred him. Moreover, although it seems curious that the two local roads—owned in part by the "Peoria"—should have thrown the whole switching charge upon it, and that the "Central" should have given up passing on a part of that charge to connecting carriers, it is even stranger that for over twenty years all the roads concerned should have misapprehended the effect of the documents under which they were operating.

We can scarcely imagine a situation, calling more loudly for the intervention of expert opinion than this welter of papers, all expressed in the jargon of a vocation which has developed its own dialect, and all to be interpreted in the light of practices which apparently went on for two decades after the last relevant document was issued. Whatever certainty is possible in such circumstances is obviously only in the possession of those who have become familiar with those "incidents" which have been "attached by usage to the transaction." The Master thought otherwise, because the Commission's jurisdiction was given to it only to prevent diversity of ruling and because the question would not arise again for it was "unique." It is indeed true that one of the most important reasons for vesting jurisdiction in the Commission was to secure uniformity; but that was not the only reason. It would be a sorry result to deprive the parties of the only really qualified tribunal because the injustice done by a mistake of an unqualified one will be limited to a single instance. We are not to confuse the extent of the Commission's jurisdiction with the motives which led to the Commission's creation. Besides, we do not see that our decision here would inevitably be "unique." If we took the Master's view that prorating had ceased to have any documentary warrant, although that might be final between the parties here, it might not satisfy the "Peoria"—now able to assert its rights that it had no claims against carriers other than the "Central." And a fortiori, if we held that prorating had continued to be the proper division, the "Peoria" might wish to assert the same claim. We will

adopt the same course as to this item that we have as to the item depending upon the Indianapolis Trackage Agreement.

## XVII.

### General Expenses.

For over twenty years it had been the practice of the "Central" to ascertain and account for the general expenses of the "Peoria" on a mixed basis as follows: (1) General expenses directly incurred for the exclusive service of the "Peoria" were directly charged; (2) some general expenses not for the exclusive service of the "Peoria" were apportioned on some use or cost basis which happened to be available, and (3) joint general expenses incurred not for the exclusive service of the "Peoria," for which there was no available basis for apportionment, were divided on the basis of the ratio between the operating revenues of the "Peoria" and the operating revenues of the system.

The Bondholders contend that they should be exonerated from these charges for general expenses to the extent that they include a part of the salaries and expenses of officers of the system and their staffs, on the ground that certain of the officers have not "served the P & E properly in certain respects or during certain periods"; and that the "Central" should be treated as a faithless fiduciary. This is in effect the same objection which they made to the allowance of "Traffic Expenses," and what we have there said in answer applies with equal force here.

The Bondholders also contend that the general expenses charged against the "Peoria" were excessive; a charge which they base almost entirely upon a comparison of expenses with other railroads, having revenues comparable with the "Peoria." What it comes down to is that the "Central" managed the operations of the "Peoria" with less than reasonable efficiency; and as to that the burden of proof was on the Bondholders. We agree with the Master that they did not prove their case. Indeed, as they themselves point out, the greater part of the putative "excess" expense is traceable to the Indianapolis office in which the work done was exclusively limited to the "Peoria"; and was necessitated by the accounting and auditing summarized in the annual statements. There was no evidence that this work could have been done at less cost if the "Peoria" had been independent; moreover much of it was an inevitable result of the "Agreement" which required revenues and expenses properly apportionable to the "Peoria" to be segregated from those of the system as a whole. That was a task which required extended computations, and hence, item for item, was more burdensome than the system accounting which did not require complicated and expensive allocations. Indeed, we question whether a finding of inefficient management may be based merely on a comparison with the operating results of other railroads: it may well be that such a comparison to have any appreciable weight requires a similarity in such a multitude of operating conditions that no other railroad offers a dependable standard. But if comparisons are to be made at all, the standards for comparison should be railroads whose accountings have involved some segregation of its share of the revenues and expenses of a larger system. That is an item which most solvent railroads escape; it is generally only in insolvency that the necessity arises in the accounts of mortgaged divisions and leased lines.

Taking into account the weight of all relevant evidence we hold that the Master's findings here too should be affirmed. Inefficient management not having been shown, it was not improper to charge against the "Peoria" the entire cost of services rendered exclusively for the "Peoria," and a share of the cost of system services determined by application of the ratio between system revenues and "Peoria" revenues.

## XVIII.

### Pullman Operations.

Both the Bondholders and the counsel for the "Peoria" asserted that charges in the accounts for Pullman car operations should be disallowed; such was the Master's conclusion, and the conclusion is not questioned by the "Central." Consequently, to the limited extent permitted by our rul-

ings as to accounts stated and the Statute of Limitations the Master's conclusion is affirmed.

### XIX.

### Miscellaneous.

The Master's rulings as to interest, and the distribution of "government cutbacks" are also affirmed.

Unless the parties can agree upon the proper amounts to be entered in a decree, the cause will be referred back to the Master to state the accounts and to report a proposed decree in accordance with the foregoing opinion.[37]

### On Petition for Rehearing.

### PER CURIAM.

The Bondholders have petitioned for a rehearing on our denial of minimums to the "Peoria," very largely repeating their former argument. They point out however that we were wrong in saying that there was no difference in the situation after 1930 if the "Central" be regarded as one system; we failed to notice that, so long as the "Big Four" and the "Peoria" formed a system separate from the New York Central system, it was not necessary for the "Big Four" to allow minimums to the "Peoria," for its share of the rate upon hauls ending upon "Big Four" rails was always at least twenty per cent of the whole rate. Therefore, the question does arise whether if, by the lease of 1930 the lessor and lessee became one road, it was an abuse of the "Central's" power over the "Peoria" not to allow it minimums over hauls in which the "Big Four" figured as an overhead carrier. As to this we are to apply the standard which we applied throughout: i. e. whether the "Peoria," assuming that it was an independent road could have exacted minimums from the combined road—the "Central." Confining ourselves therefore to the period after 1930, and assuming that the lease of the "Big Four" to the New York Central Railroad gave the lessee a free choice to allow minimums, and that it might do so without recourse to the Interstate Commerce Commission, we are to say whether it should have done so; which means whether the "Peoria" has proved that in dealing at arms length with the "Central" it could have exacted this as a condition. The Master has found that minimums of twenty per cent were not by any means uniformly allowed to all small roads; and that the issue seems to have been a matter of private bargaining. The Bondholders point to the fact that the "Peoria" secured the minimum upon hauls that left its rails upon which the "Big Four" was not an overhead carrier, as evidence that it could have procured them at arms length bargaining. These minimums the "Big Four" secured for the "Peoria"; the "Peoria" did not secure them for itself; and the difference is extremely material. To take an instance which seems particularly impressive at first blush: the minimum granted by the Pennsylvania for traffic which left the "Peoria's" rails at Indianapolis. The argument is that the "Central" would have been obliged to meet Pennsylvania competition by a like concession; but it does not follow that the "Peoria" dealing with both the "Central" and the Pennsylvania would have been able to get a minimum—or at least a minimum of twenty per cent—from either of them. As we have said, there were a number of cases in which small roads could not do so. In the supposititious case we have made the test, we must imagine the "Peoria," not speaking as part of a great system, but as a road 212 miles in length which alone had never succeeded in keeping alive. How can we measure the strength of its bargaining power?

Nor are those instances persuasive where divisions of a road continued to receive minimums after they had been taken over by another road. The Springfield division of the "Big Four" was such an instance; the minimum had existed since 1890 when the Springfield division was part of the same road as the "Peoria" itself. There were apparently a number of such cases; and, whether they were thought to be preserved under § 76(b) of Title 49 U.S.C.A.; or out of mere conservatism; or for some other reason, does not appear; but at least

---

[37] The substance of Judge Hincks' original drafts discussing a number of items—notably VII—I have incorporated in the above opinion.

they are not evidence which makes against the Master's finding that the Bondholders did not prove that a minimum of twenty per cent was the invariable or regular practise. But it may be said that the Interstate Commerce Commission might have intervened to compel the grant of such a minimum. There would indeed, upon the hypothesis we are assuming, have been a division of joint rates, and the Commission would have had jurisdiction; but we do not see that we have any indication as to how it would have exercised its power. So we conclude that, viewed as a question of what the "Peoria," if it stood alone against the "Central" could have secured, the Bondholders did not present a case which shows that the Master's finding was "clearly erroneous." That finding is one of fact in the strictest sense; it included no "standard," no "norm"; it was merely as to what was the practice of railroads.

Indeed, the question is more complicated than we have indicated. We have held that we could pass upon the division of income received, because as between the "Peoria" and the "Big Four," as part of the "Central," there was no "division of 'joint rates,' appearing in 'joint tariffs' " which "contain the names of the participating carriers." However there continued to be "divisions of 'joint rates' appearing in 'joint tariffs' " between the "Big Four" and the New York Central Railroad, after the lease of 1930 as well as there had been before, and over these the Commission had exclusive jurisdiction. Any minimum granted by the New York Central Railroad, as lessee of the "Big Four," would affect the division of "joint rates" between itself and the "Big Four," and we should not have jurisdiction to pass upon it. At most we could say that the "Central" should divide the share of the joint rates which came to the "Big Four" —as between itself and the "Peoria"—as

though the "Peoria" had been granted a minimum in a division between the three. That, however, presupposes that the Commission would have granted the minimum, had the matter come before it; and, as we have just said, that we cannot know. Moreover, although, perhaps in logic we should remain within the limits of our jurisdiction in making such a division, we should be really acting as a substitute for the Commission which we have not the competence to do. This difficulty cannot be avoided by saying that in fixing the division of the joint rate between the "Big Four" and the New York Central Railroad, the latter could, by consenting to give a minimum to the "Peoria," avoid the Commission under § 76(b) of Title 49 U.S.C.A. It is true that it was a lessee, but, since the two roads are treated for purposes of rate divisions as separate carriers, it is highly improbable that the New York Central would be allowed to consent for the "Big Four" to a reduction in the "Big Four's" share, such as would result from the grant of a minimum to the "Peoria." Even as majority shareholder of the "Big Four," the New York Central Railroad could not lawfully give such a consent, unless the situation of the "Big Four" vis-a-vis the "Peoria" independently justified it. It would therefore seem to us that to the limited degree to which we can on any theory have jurisdiction, it is extremely doubtful that we should attempt to exercise it; even were we satisfied that the Master's finding was "clearly erroneous." Whether for the future the "Peoria" would have any standing before the Commission as a party interested in the division of rates between the "Big Four" and the New York Central Railroad, we cannot of course say; but on this record we see no reason to change our first decision.

Petition denied.